**MONETTI, S.P.A., and Melform U.S.A., Inc., Plaintiffs–Appellants,**

v.

**ANCHOR HOCKING CORPORATION, Defendant–Appellee.**

**No. 90–2570.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1991.
Decided May 1, 1991.

Jonathan G. Bunge, Stephen L. Agin, Kevin Tottis, Jill E. Evans, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs-appellants.

John A. Relias, Jeannine M. Pisoni, Jennifer A. Murphy, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr. and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This is a diversity suit for breach of contract; the parties agree that Illinois law governs the substantive issues. The district judge dismissed the suit, on the defendant's motion for summary judgment, as barred by the statute of frauds, and also refused to allow the plaintiffs to amend their complaint to add a claim of promissory estoppel. The appeal, which challenges both rulings, presents difficult and important questions concerning both the general Illinois statute of frauds, Ill.Rev.Stat. ch. 59, ¶ 1, and the statute of frauds in the Uniform Commercial Code, UCC § 2-201, adopted by Illinois in Ill.Rev.Stat. ch. 26, ¶ 2-201.

The plaintiffs are Monetti, an Italian firm that makes decorative plastic trays and related products for the food service industry, and a wholly owned subsidiary, Melform U.S.A., which Monetti set up in 1981 to market its products in the U.S. In 1984, Monetti began negotiations with a father-and-son team, the Schneiders, importers of food service products, to grant the Schneiders the exclusive right to distribute Monetti's products in the United States and in connection with this grant to turn over to them Melform's tangible and intangible assets. While these negotiations were proceeding, the Schneiders sold their importing firm to Anchor Hocking, the defendant, and their firm became a division of Anchor Hocking, though—at first—the Schneiders remained in charge. In the fall of 1984, the younger Schneider, who was

handling the negotiations with Monetti for his father and himself, sent Monetti a telex requesting preparation of an agreement "formalizing our [i.e., Anchor Hocking's] exclusive for the United States." In response, Monetti terminated all of Melform's distributors and informed all of Melform's customers that Anchor would become the exclusive U.S. distributor of Monetti products on December 31, 1984.

On December 18, the parties met, apparently for the purpose of making a final agreement. Monetti—which incidentally was not represented by counsel at the meeting—submitted a draft the principal provisions of which were that Anchor Hocking would be the exclusive distributor of Monetti products in the U.S., the contract would last for ten years, and during each of these years Anchor Hocking would make specified minimum purchases of Monetti products, adding up to $27 million over the entire period. No one from Anchor Hocking signed this or any other draft of the agreement. However, the record contains a memo, apparently prepared for use at the December 18 meeting, entitled "Topics of Discussion With Monetti." The memo's first heading is "Exclusive Agreement—Attachment # 1"—a reference to an attached draft which is identical to the Monetti draft except for two additional, minor paragraphs added in handwriting. Under the heading appears the notation "Agree" beside each of the principal paragraphs of the agreement, with one exception: beside the first paragraph, the provision for exclusivity, the notation is "We want Canada" (i.e., exclusive distribution rights in Canada as well as in the U.S.). On the bottom of the left-hand side of the last page appears the legend "SS/mh"—indicating that the younger Schneider (Steve Schneider) had dictated the memo to a secretary.

Shortly after the December 18 meeting, Monetti—which had already, remember, terminated Melform's distributors and informed Melform's customers that Anchor Hocking would be the exclusive distributor of Monetti products in the United States as of the last day of 1984—turned over to Anchor Hocking all of Melform's inventory, records, and other physical assets, together with Melform's trade secrets and know-how.

Several months later, in May 1985, Anchor Hocking abruptly fired the Schneiders. Concerned about the possible implications of this démarche for its relationship with Anchor Hocking, Monetti requested a meeting between the parties, and it was held on May 19. Reviewing the events up to and including that meeting, a memo dated June 12, 1985, from Raymond Davis, marketing director of Anchor Hocking's food services division, to the law department of Anchor Hocking, states that "In the middle to latter part of 1984 Irwin Schneider and his company were negotiating an agreement with [Monetti and Melform] to obtain exclusive distribution rights on Melform's plastic tray product line in the United States"; "later, this distribution agreement was expanded to also include Canada, the Caribbean and Central and South America"; there had been many meetings between the parties, including the meeting of May 19 (at which Davis had been present); "Exhibit A (attached) represents the summary agreement that was reached in the meeting. You will notice that I have added some handwritten changes which I believe represents more clearly our current position regarding the agreement.... Now that we have had our 'New Management' [i.e., the management team that had replaced the Schneiders] meeting with Monetti, both parties would like to have a written and signed agreement to guide this new relationship." Exhibit A to the Davis memo is identical to Attachment # 1 to Steve Schneider's memo, except that it contains the handwritten changes to which the Davis memo refers. Shortly after this memo was written, the parties' relationship began to deteriorate, and eventually Monetti sued for breach of contract.

Illinois' general statute of frauds forbids a suit upon an agreement that is not to be performed within a year "unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed

by the party to be charged therewith, or some other person thereunto by him lawfully authorized." The statute of frauds in Article 2 of the Uniform Commercial Code makes a contract for the sale of goods worth at least $500 unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." The differences between these formulations are subtle but important. The Illinois statute requires that the writing "express the substance of the contract with reasonable certainty." *Frazer v. Howe*, 106 Ill. 564, 574 (1883); see also *Holsz v. Stephen*, 362 Ill. 527, 532, 200 N.E. 601, 603 (1936); *Mariani v. School Directors*, 154 Ill.App.3d 404, 407, 107 Ill.Dec. 90, 92, 506 N.E.2d 981, 983 (1987). The UCC statute of frauds does not require that the writing contain the terms of the contract. Ill.Code Comment 1 to UCC § 2–201. In fact it requires no more than written corroboration of the alleged oral contract. Even if there is no such signed document, the contract may still be valid "with respect to goods … which have been received and accepted." § 2–201(3)(c). This provision may appear to narrow the statute of frauds still further, but if anything it curtails a traditional exception, and one applicable to Illinois' general statute: the exception for partial performance, on which see, for example, *Payne v. Mill Race Inn*, 152 Ill.App.3d 269, 277–78, 105 Ill.Dec. 324, 330–331, 504 N.E.2d 193, 199–200 (1987); *Grundy County National Bank v. Westfall*, 13 Ill. App.3d 839, 845, 301 N.E.2d 28, 32 (1973). The Uniform Commercial Code does not treat partial delivery by the party seeking to enforce an oral contract as a partial performance of the *entire* contract, allowing him to enforce the contract with respect to the undelivered goods.

■ Let us postpone the question of partial performance for a moment and focus on whether there was a signed document of the sort that the statutes of frauds require. The judge, over Monetti's objection, refused to admit oral evidence on this question. He was right to refuse. The use of oral evidence to get round the requirement of a writing would be bootstrapping, would sap the statute of frauds of most of its force, and is therefore forbidden. *Western Metals Co. v. Hartman Co.*, 303 Ill. 479, 485, 135 N.E. 744, 746 (1922); *R.S. Bennett & Co. v. Economy Mechanical Industries, Inc.*, 606 F.2d 182, 186 n. 4 (7th Cir.1979); *Bazak International Corp. v. Mast Industries, Inc.*, 73 N.Y.2d 113, 117–18, 538 N.Y. S.2d 503, 505, 535 N.E.2d 633, 635 (1989). *The Hip Pocket, Inc. v. Levi Strauss & Co.*, 144 Ga.App. 792, 793, 242 S.E.2d 305, 306 (1978), is *contra*, but does not discuss the question and is, we think, wrong; while *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1034 (5th Cir.1982), on which Monetti also relies, is distinguishable from our case because there the writing was first held to satisfy the statute of frauds and only then was oral evidence admitted to clear up a detail, albeit a vital one—the identity of one of the parties!

■ Although we have cited cases from different jurisdictions, the question whether oral evidence is admissible to show that an ambiguous document satisfies the requirements of the statute of frauds is ultimately one of state law. So far as we have been able to discover, the question is uniformly assumed to be substantive rather than procedural for purposes of determining, in accordance with the *Erie* doctrine, whether state or federal law applies, though direct authority on the question is sparse. *Lehman v. Dow, Jones & Co.*, 606 F.Supp. 1152, 1156 (S.D.N.Y.1985); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 (1st Cir. 1985) (dictum); 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4512, at pp. 194–95 (1982). We think the assumption is well founded, although the point is not crucial in this case because neither party questions the applicability of Illinois law. It is true that a statute of frauds is procedural in form and that its main proximate goal is evidentiary; it is largely based on distrust of the ability of juries to determine the truth of testimony that there was or was not a contract. 2 E.

Allan Farnsworth, *Farnsworth on Contracts* § 6.1, at p. 85 (1990). But it is usually and we think correctly regarded as a part of contract law, not of general procedural law. Cf. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364 (7th Cir.1990). It is designed to make the contractual process cheaper and more certain by encouraging the parties to contracts to memorialize their agreement. The end of the statute of frauds thus is substantive (albeit the means is procedural), which makes essential aspects of the administration of the statute, such as the admissibility of oral evidence to disambiguate an ambiguous document that is contended to satisfy the statute of frauds, a matter of primary concern to the states rather than to the federal government. So Illinois law applies to the issue; and *Western Metals* indicates that Illinois courts would not allow oral evidence to be used to enable a vague document to satisfy the statute of frauds.

█ Because oral evidence was inadmissible on the question whether the documents meet the requirements of the statutes of frauds, it was proper for the judge to resolve it on motion for summary judgment. The parties agree that, if this was proper, our review is plenary. This does not follow, however, from the documentary character of the issue, *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), as the parties may believe. But in view of the parties' agreement concerning the proper scope of our review, we need not resolve the matter, beyond noting that there is authority, illustrated by the *Bazak* case, for regarding the issue as one of law, not fact—and if it is an issue of law, then our review is indeed plenary.

We have two documents (really, two pairs of documents) to consider. The first is Steve Schneider's "Topics for Discussion" memo with its "Attachment # 1." Since "signed" in statute-of-frauds land is a term of art, meaning executed or adopted by the defendant, *Weston v. Myers*, 33 Ill. 424, 433 (1864); UCC § 1–201(39) and Ill. Code Comment thereto; 2 *Farnsworth on Contracts, supra,* § 6.8, at p. 144, Schneider's typed initials are sufficient. The larger objection is that the memo was written before the contract—any contract—was made. The memo indicates that Schneider (an authorized representative of the defendant) agrees to the principal provisions in the draft agreement prepared by Monetti, but not to all the provisions; further negotiations are envisaged. There was no contract when the memo was prepared and signed, though it is fair to infer from the memo that a contract much like the draft attached to it would be agreed upon—if Monetti agreed to Anchor Hocking's demand for Canada, as Monetti concedes (and the Davis memo states) it did.

Can a memo that precedes the actual formation of the contract ever constitute the writing required by the statute of frauds? Under the Uniform Commercial Code, why not? Its statute of frauds does not require that any contracts "be in writing." All that is required is a document that provides solid evidence of the existence of a contract; the contract itself can be oral. Three cases should be distinguished. In the first, the precontractual writing is merely one party's offer. We have held, interpreting Illinois' version of the Uniform Commercial Code, that an offer won't do. *R.S. Bennett & Co. v. Economy Mechanical Industries, Inc., supra,* 606 F.2d at 186. Otherwise there would be an acute danger that a party whose offer had been rejected would nevertheless try to use it as the basis for a suit. The second case is that of notes made in preparation for a negotiating session, and this is another plausible case for holding the statute unsatisfied, lest a breakdown of contract negotiations become the launching pad for a suit on an alleged oral contract. Third is the case—arguably this case—where the precontractual writing—the Schneider memo and the attachment to it—indicates the promisor's (Anchor Hocking's) acceptance of the promisee's (Monetti's) offer; the case, in other words, where all the essential terms are stated in the writing and the only problem is that the writing was prepared before the contract became final. The only difficulty with holding that

such a writing satisfies the statute of frauds is the use of the perfect tense by the draftsmen of the Uniform Commercial Code: the writing must be sufficient to demonstrate that "a contract for sale *has been made....* The 'futuristic' nature of the writing disqualifies it." *Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir.1986) (emphasis in original); see also *American Web Press, Inc. v. Harris Corp.,* 596 F.Supp. 1089, 1093 (D.Colo.1983). Yet under a general statute of frauds, "it is well settled that a memorandum satisfying the Statute may be made before the contract is concluded." *Farrow v. Cahill,* 663 F.2d 201, 209 (D.C. Cir.1980) (footnote omitted). And while merely because the UCC's draftsmen relaxed one requirement of the statute of frauds—that there be a writing containing all the essential terms of the contract—doesn't exclude the possibility that they wanted to stiffen another, by excluding writings made before the contract itself was made, the choice of tenses is weak evidence. No doubt they had in mind, as the typical case to be governed by section 2–201, a deal made over the phone and evidenced by a confirmation slip. They may not have foreseen a case like the present, or provided for it. The distinction between what is assumed and what is prescribed is critical in interpretation generally.

█ In both of the decisions that we cited for the narrow interpretation, the judges' concern was with our first two classes of case; and judicial language, like other language, should be read in context. *Micromedia* involved an offer; in *American Web,* negotiations were continuing. We agree with Professor Farnsworth that in appropriate circumstances a memorandum made before the contract is formed can satisfy the statute of frauds, 2 *Farnsworth on Contracts, supra,* § 6.7, at p. 132 and n. 16, including the UCC statute of frauds. This case illustrates why a rule of strict temporal priority is unnecessary to secure the purposes of the statute of frauds. Farnsworth goes further. He would allow a written *offer* to satisfy the statute, provided of course that there is

oral evidence it was accepted. *Id.,* n. 16. We needn't decide in this case how far we would go with him, and therefore needn't reexamine *Bennett.*

█ Nor need we decide whether the first memo (Schneider's) can be linked with the second (Davis's)—probably not, since they don't refer to each other, *Poulos v. Reda,* 165 Ill.App.3d 793, 800, 117 Ill.Dec. 465, 471, 520 N.E.2d 816, 822 (1987); *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 767 n. 5 (5th Cir.1988)—to constitute a post-contract writing and eliminate the issue just discussed. For, shortly after the Schneider memo was prepared, Monetti gave dramatic evidence of the existence of a contract by turning over its entire distribution operation in the United States to Anchor Hocking. (In fact it had started to do this even earlier.) Monetti was hardly likely to do that without a contract—without in fact a contract requiring Anchor Hocking to purchase a minimum of $27 million worth of Monetti's products over the next ten years, for that was a provision to which Schneider in the memo had indicated agreement, and it is the only form of compensation to Monetti for abandoning its distribution business that the various drafts make reference to and apparently the only one the parties ever discussed.

This partial performance took the contract out of the general Illinois statute of frauds. Unilateral performance is pretty solid evidence that there really was a contract—for why else would the party have performed unilaterally? Almost the whole purpose of contracts is to protect the party who performs first from being taken advantage of by the other party, so if a party performs first there is some basis for inferring that he had a contract. The inference of contract from partial performance is especially powerful in a case such as this, since while the nonenforcement of an oral contract leaves the parties free to pursue their noncontractual remedies, such as a suit for quantum meruit (a form of restitution), *Farash v. Sykes Datatronics, Inc.,* 59 N.Y.2d 500, 503, 465 N.Y.S.2d 917, 918, 452 N.E.2d 1245, 1246 (1983); *Robertus v.*

*Candee,* 205 Mont. 403, 407, 670 P.2d 540, 542 (1983); 2 *Farnsworth on Contracts, supra,* § 6.11, at p. 171, once Monetti turned over its trade secrets and other intangible assets to Anchor Hocking it had no way of recovering these things. (Of course, Monetti may just have been foolish.) The partial-performance exception to the statute of frauds is often explained (and its boundaries fixed accordingly) as necessary to protect the reliance of the performing party, so that if he can be made whole by restitution the oral contract will not be enforced. This is the Illinois rationale, *Payne v. Mill Race Inn, supra,* 152 Ill.App.3d at 277–78, 105 Ill.Dec. at 330–331, 504 N.E.2d at 199–200, and it is not limited to Illinois. 2 *Farnsworth on Contracts, supra,* § 6.9. It supports enforcement of the oral contract in this case.

This discussion assumes, however, that the contract is governed by the general Illinois statute of frauds rather than, as the district judge believed, by the UCC's statute of frauds (or in addition to it—for both might apply, as we shall see), with its arguably narrower exception for partial performance. The UCC statute of frauds at issue in this case appears in Article 2, the sale of goods article of the Code, and, naturally therefore, is expressly limited to contracts for the sale of goods. That is a type of transaction in which a partial-performance exception to a writing requirement would make no sense if the seller were seeking payment for more than the goods he had actually delivered. Suppose A delivers 1,000 widgets to B, and later sues B for breach of an alleged oral contract for 100,000 widgets and argues that the statute of frauds is not a bar because he performed his part of the contract in part. In such a case partial performance just is not indicative of the existence of an oral contract for any quantity greater than that already delivered, so it is no surprise that the statute of frauds provides that an oral contract cannot be enforced in a quantity greater than that received and accepted by the buyer. § 2–201(3)(c); cf. § 2–201(1). The present case is different. The partial performance here consisted not of a delivery of goods alleged to be part of a larger order but the turning over of an entire business. *That* kind of partial performance *is* evidence of an oral contract and also shows that this is not the pure sale of goods to which the UCC's statute of frauds was intended to apply.

This is not to say that the *contract* is outside the Uniform Commercial Code. It is a contract for the sale of goods plus a contract for the sale of distribution rights and of the assets associated with those rights. Courts forced to classify a mixed contract of this sort ask, somewhat unhelpfully perhaps, what the predominant purpose of the contract is. *Yorke v. B.F. Goodrich Co.,* 130 Ill.App.3d 220, 223, 85 Ill.Dec. 606, 608, 474 N.E.2d 20, 22 (1985), and cases cited there. And, no doubt, they would classify this contract as one for the sale of goods, therefore governed by the UCC, because the $27 million in sales contemplated by the contract (if there was a contract, as we are assuming) swamped the goodwill and other intangibles associated with Melform's very new, very small operation. Distributorship agreements, such as this one was in part, and even sales of businesses as going concerns, are frequently though not always classified as UCC contracts under the predominant-purpose test. Compare *De Filippo v. Ford Motor Co.,* 516 F.2d 1313, 1323 (3d Cir.1975); *Hudson v. Town & Country True Value Hardware, Inc.,* 666 S.W.2d 51, 53 (Tenn. 1984); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 394, 454 A.2d 367, 376 (1983); and *WICO Corp. v. Willis Industries,* 567 F.Supp. 352, 355 (N.D.Ill.1983) (applying Illinois law), with *Lorenz Supply Co. v. American Standard, Inc.,* 419 Mich. 610, 615, 358 N.W.2d 845, 847 (1984).

We may assume that the UCC applies to this contract; but must *all* of the UCC apply? We have difficulty seeing why. It is not a matter of holding the contract partly enforceable and partly unenforceable, a measure disapproved in *Distribu-Dor, Inc. v. Karadanis,* 11 Cal.App.3d 463, 468, 90 Cal.Rptr. 231, 234 (1970). Because of the contract's mixed character, the UCC statute of frauds doesn't make a nice fit;

it's designed for a pure sale of goods. The general statute works better. The fact that Article 2, which we have been loosely referring to as the sale of goods article, in fact applies not to the sale of goods as such but rather to "transactions in goods," § 2–102, while its statute of frauds is limited to "contract[s] for the sale of goods," § 2–201(1), could be thought to imply that the statute of frauds does not cover every transaction that is otherwise within the scope of Article 2. 2 *Farnsworth on Contracts, supra,* § 6.6, at p. 126 and n. 5. Perhaps the contract in this case is better described as a transaction in goods than as a contract for the sale of goods, since so much more than a mere sale of goods was contemplated.

■ Another possibility is to interpret the UCC statute of frauds flexibly (an approach endorsed in *Meyer v. Logue,* 100 Ill.App.3d 1039, 1044–46, 56 Ill.Dec. 707, 710–12, 427 N.E.2d 1253, 1256–58 (1981)) in consideration of the special circumstances of the class of cases represented by this case, so that it does make a smooth fit. There is precedent for doing this. When the partial performance is not the delivery of some of the goods but part payment for all the goods, most courts will enforce oral contracts under the UCC. *Sedmak v. Charlie's Chevrolet, Inc.,* 622 S.W.2d 694, 698–99 (Mo.App.1981); *W.I. Snyder Corp. v. Caracciolo,* 373 Pa.Super. 486, 494–95, 541 A.2d 775, 779 (1988); *The Press, Inc. v. Fins & Feathers Publishing Co.,* 361 N.W.2d 171, 174 (Minn.App.1985). Such cases do not present the danger at which the limitation on using partial performance to take the entire contract outside of the statute of frauds was aimed, that of the seller's unilaterally altering the quantity ordered by the buyer, although they could be thought to present the analogous danger of the seller's unilaterally altering the price the buyer had agreed to pay—by claiming that full payment was actually part payment. *This* case, at all events, presents no dangers of the sort the provision in question was designed to eliminate. The semantic lever for the interpretation we are proposing is that the UCC does not abolish the partial-performance exception.

It merely limits the use of partial delivery as a ground for insisting on the full delivery allegedly required by the oral contract. That is not what Monetti is trying to do.

■ We need not pursue these interesting questions about the applicability and scope of the UCC statute of frauds any further in this case, because our result would be unchanged no matter how they were answered. For we have said nothing yet about the second writing in the case, the Davis memorandum of June 12. It was a writing on Anchor Hocking's letterhead, so satisfied the writing and signature requirements of the UCC statute of frauds, and it was a writing sufficient to evidence the existence of the contract upon which Anchor Hocking is being sued. It is true that "Exhibit A" does not contain all the terms of the contract; it makes no reference to the handing over of Melform's assets. But, especially taken together with the Davis memo itself (and we are permitted to connect them provided that the connections are "apparent from a comparison of the writings themselves," *Western Metals Co. v. Hartman Co., supra,* 303 Ill. at 483, 135 N.E. at 746, and they are, since the Davis memo refers explicitly to Exhibit A), Exhibit A is powerful evidence that there was a contract and that its terms were as Monetti represents. Remember that the UCC's statute of frauds does not require that the contract be in writing, but only that there be a sufficient memorandum to indicate that there really was a contract. The Davis memorandum fits this requirement to a t. So even if the partial-performance doctrine is not available to Monetti, the UCC's statute of frauds was satisfied. And since the general Illinois statute was satisfied as well, we need not decide whether, since the contract in this case both was (we are assuming) within the UCC *and* could not be performed within one year, it had to satisfy both statutes of frauds. 2 *Farnsworth on Contracts, supra,* § 6.2, at pp. 90–91.

Our conclusion that Monetti's suit for breach of contract is not barred by the statute(s) of frauds makes the district judge's second ruling, refusing to allow

Monetti to add a claim for promissory estoppel, academic. The only reason Monetti wanted to add the claim was as a backstop should it lose on the statute of frauds. In light of our decision today, he does not need a backstop.

Can promissory estoppel be used to avoid the limitations that the statute of frauds places on the enforcement of oral promises? It can be argued that a party to a contract for the sale of goods should not be allowed to get around the statute of frauds merely by alleging promissory estoppel and using partial performance to establish the necessary reliance in circumstances in which the requirements for the exception in the statute of frauds for partial performance would for one reason or another not be satisfied. It can further be argued that since promissory estoppel unlike equitable estoppel is a method of establishing contractual liability, the statute of frauds should be no less applicable than if the contract were supported by consideration or a seal rather than by promissory estoppel. *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 725 F.2d 1140, 1142 (7th Cir. 1984). On the other side it can be argued that promissory estoppel is deliberately open-ended, and should therefore remain available to overcome, in appropriate cases, possible rigidities in the statute of frauds. *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 133 N.W.2d 267 (1965). Consistent with this counterargument, we held in *R.S. Bennett & Co. v. Economy Mechanical Industries, Inc.*, supra, 606 F.2d at 187–89, that Illinois' version of the UCC statute of frauds was inapplicable to promissory estoppel cases. *Janke Construction Co. v. Vulcan Materials Co.*, 386 F.Supp. 687, 697 (W.D.Wis.1974), aff'd, 527 F.2d 772 (7th Cir.1976), reached a similar conclusion under Wisconsin's general statute of frauds, and in affirming we cut loose promissory estoppel from contract law, thus answering the second argument in favor of applying the statute of frauds in promissory estoppel cases. *Id.* at 777. See also 2 *Farnsworth on Contracts, supra,* § 6.12, at p. 185 n. 26. We have been having second thoughts lately. *Goldstick v. ICM Realty*, 788 F.2d 456, 464–66 (7th Cir.1986); *Evans v. Fluor Distribution Cos.*, 799 F.2d 364, 367–68 (7th Cir.1986). But as in *Goldstick* and *Evans*, so in this case, we need not and do not decide whether *Bennett* was an accurate forecast of Illinois law. Not only is the issue moot in view of our decision that the statute of frauds does not bar Monetti from enforcing the contract, but *Bennett* was not a case in which the plaintiff was using promissory estoppel to avoid the UCC's provision disallowing a defense to the statute of frauds for partial performance consisting of the delivery of some but not all of the quantity allegedly contracted for orally. It is in such a case that the "end run" character of promissory estoppel appears most strongly; yet we need not and do not decide whether the appearance is so strong as to preclude resort to promissory estoppel.

REVERSED AND REMANDED.