WELLS, WATERS & GASES, INCORPORATED, Plaintiff–Appellant,

v.

AIR PRODUCTS & CHEMICALS, INCORPORATED, Defendant–Appellee.

WELLS, WATERS & GASES, INCORPORATED, Plaintiff–Appellee,

v.

AIR PRODUCTS & CHEMICALS, INCORPORATED, Defendant–Appellant.

Nos. 93–1264, 93–1315.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1993.

Decided March 22, 1994.

As Amended April 29, 1994.

**ARGUED:** Joseph Harvey Roberts, Wise, VA, for appellant.

Melissa Warner Scoggins, Gentry, Locke, Rakes & Moore, Roanoke, VA, for appellee.

**ON BRIEF:** Phillip V. Anderson, Gentry, Locke, Rakes & Moore, Roanoke, VA, for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

Appellant Wells, Waters & Gases, Inc. ("Wells Waters") brought suit against appellee Air Products & Chemicals, Inc. ("Air Products"), and Air Products counterclaimed against Wells Waters. Each alleged that the other had breached a contract between the two. Upon opposing motions for summary judgment, the district court found Wells Waters in breach and granted judgment accordingly. Wells Waters appeals.[1] For the reasons given below, we affirm.

### I.

The relevant facts are not in dispute. Air Products is a supplier, and Wells Waters a distributor, of gas products. From 1987 until 1990, Air Products sold gas products to Oxyco, Inc. ("Oxyco"), which, prior to the formation of Wells Waters, operated the business now operated by Wells Waters. Oxyco would sell the gas products to local retail customers. The gas products were stored in cylinders which, throughout these transactions, always remained the property of Air Products. Air Products leased these cylinders to Oxyco and charged Oxyco a rental fee, or "demurrage."

In late 1989 or early 1990, Roy and Roger Wells, the principals of Oxyco, formed Wells Waters. Wells Waters purchased the assets and inventory, and undertook the businesses, of Oxyco and another corporation. At the time, Air Products claimed that Oxyco owed Air Products $16,240 in outstanding demurrage. Wells Waters did not assume Oxyco's liabilities and, although Wells Waters did pay some of Oxyco's debt, most remained unpaid.

Prior to June 1990, Roy and Roger Wells informed Air Products that the business and assets of Oxyco had been transferred to Wells Waters and sought to have Air Products do business with Wells Waters. In June of 1990, Air Products submitted a proposed cylinder products distributor agreement (the "Agreement") to Wells Waters. The Agreement provided for a business arrangement similar to the one described above between Oxyco and Air Products. The Agreement was to last for five years, commencing July 1, 1990. Air Products also submitted an attachment to the Agreement (the "Attachment") which called for Wells Waters either to conduct by July 16, 1990, a bar code audit of Air Products' cylinders then in Wells Waters' possession and to agree to accept financial responsibility for demurrage due on those cylinders or, should Wells Waters not conduct such a bar code audit by July 16, 1990, to accept financial responsibility for 1,696 cylinders.

Paragraph 21 of the Agreement contained an acceptance clause which reads as follows: "This Agreement is subject to acceptance at [Air Products'] general office." J.A. 935.

On June 26, 1990, Roy Wells, in his capacity as president of Wells Waters, signed the Agreement and, although he did not sign or initial the Attachment, placed his initials next to paragraph 21 of the Agreement, which states: "See Attachment 1". J.A. 935. On

---

1. Air Products is no longer pursuing its appeal. *See infra* note 3.

that same date, Wayne Porter, an agent of Air Products, placed his initials at several places on the Agreement and initialed the Attachment as well. It is uncontested that Porter signed his initials to the Agreement in Virginia; Air Products' general office is located in Pennsylvania. The space provided for the signature of an Air Products' representative at the end of the Agreement, above which appeared the phrase, "ACCEPTED at Allentown, Pennsylvania," J.A. 935, remained blank.

Commencing July 1, 1990, in accordance with the terms of the Agreement, Air Products shipped gas products in cylinders to Wells Waters, which accepted delivery. Wells Waters failed to perform a bar code audit by July 16, 1990.[2] Nevertheless, on July 16, 1990, Wells Waters submitted a fax to Air Products agreeing to accept responsibility for only 664 cylinders. By letter dated July 17, 1990, Air Products rejected Wells Waters' acceptance of responsibility for only 664 cylinders, demanding instead that it accept responsibility for 1,696 cylinders, as called for by the Attachment to the Agreement.

In the months of August, September and October 1990, Air Products submitted invoices to Wells Waters which sought demurrage payments based on 1,696 cylinders. Wells Waters forwarded checks to Air Products which covered demurrage based on only 664 cylinders. Air Products never negotiated any of these checks.

On September 14, 1990, Andrew E. Cummins, Air Products' Vice President of Marketing, accepted the Agreement in writing at Air Products' general office in Allentown, Pennsylvania.

On October 25, 1990, Air Products terminated the Agreement, purportedly pursuant to paragraph 18(d) thereof, which allows for termination by Air Products "[i]f any amount due and owing to [Air Products] for goods and services or for container charges shall be past due for more than 30 days." J.A. 935.

In December of 1990, Wells Waters sued Air Products for breach of contract. Air Products counterclaimed,[3] alleging that Wells Waters was in breach. Air Products sought past due demurrage and the value of cylinders which, pursuant to the Agreement, Wells Waters had been obligated to return to Air Products, but which Air Products alleged remained in Wells Waters' possession or had been lost.

On opposing motions for summary judgment, the district court found Wells Waters to be in breach of contract. It found, as Air Products had argued, that Wells Waters bore responsibility for a total of 1,912 cylinders, consisting of 1,696 cylinders for which responsibility had been assumed pursuant to the Attachment, and an additional 216 cylinders which Air Products alleged had been transferred to Wells Waters after July 1, 1990, and remained in Wells Waters' possession. The district court found that, ultimately, following the termination of the Agreement, Wells Waters returned 1,236 cylinders to Air Products, leaving 676 of Air Products' cylinders in Wells Waters' possession. The court granted judgment to Air Products in the amount of $165,786.00, consisting of the value of the 676 cylinders and past due demurrage. Wells Waters appeals.

## II.

The district court correctly applied the substantive laws of Virginia in this diversity action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (in diversity cases, federal district court should apply choice of law rules of state in which it sits). In particular, because the contract in this case predominantly involves the sale of goods, the Virginia version of the Uniform Commercial Code ("UCC"), codified at Va.Code Ann. §§ 8.1–

---

2. While it appears that, earlier in the action, Wells Waters did claim to have made such an audit, no such claim is advanced on appeal.

3. Air Products also brought third party claims against Oxyco, and Roy and Roger Wells. The district court dismissed Air Products' claim against Oxyco as moot in light of Air Products' victory against Wells Waters, and declined to pierce the corporate veil to allow Air Products to hold Roy and Roger Wells liable for Wells Waters' debt. Air Products is no longer pursuing these claims on appeal.

101 to 8.9–507 (Michie 1991 & Supp.1993), applies. Va.Code Ann. § 8.2–102 (Michie 1991).

▮ Because the Agreement was specifically made "subject to acceptance at [Air Products'] general office," and because no such acceptance was executed until September 14, 1990, it is clear, as the district court found, that Roy Wells' signing and Wayne Porter's initialing of the Agreement on June 26, 1990, did not result in contract formation.[4] However, the district court found that a contract was nevertheless created prior to Wells Waters' fax of July 16th by virtue of Air Products' unilateral decision to begin performance under the terms of the Agreement. Although its conclusion was correct, the district court erroneously relied on UCC § 2–206(1)(b), which provides: "Unless otherwise unambiguously indicated by the language or circumstances[,] ... an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either .by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods...." Va.Code Ann. § 8.2–206(1)(b) (Michie 1991). The district court treated the signing of the Agreement by Wells Waters as an offer, pursuant to section 2–206(1)(b), which Air Products accepted by performing according to the terms of the Agreement. The Agreement, however, explicitly conditioned acceptance by Air·Products *at its general office.*

Because the language of the Agreement unambiguously indicated otherwise, Air Products could not accept the Agreement by performance under section 2–206(1)(b).

▮ The case at bar is governed by UCC § 2–204(1), Va.Code Ann. § 8.2–204(1) (Michie 1991). That section provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Section 2–204(1) applies here [5] and, thus, the conclusion of the district court that a contract came into being as a result of the parties' conduct is correct.[6]

Because of the manner in which contract formation occurred, we must turn to UCC § 2–207(3) to determine the applicable terms of the contract:

Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such cases the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms under any provisions of this Act.

Va.Code Ann. § 8.2–207(3) (Michie 1991). Following section 2–207(3), the district court correctly concluded that the terms of the

---

4. The district court correctly distinguished *J. B. Moore Electrical Contractor, Inc. v. Westinghouse Electric Supply Co.,* 221 Va. 745, 273 S.E.2d 553 (1981). There, a supplier, aware that a subcontractor was to submit a bid for a project and after having reviewed the specifications of that project, submitted a purchase order to the subcontractor. Although the purchase order stated that it was subject to the supplier's acceptance at its office, the order had no signature line for the supplier. The Supreme Court of Virginia held: "Since the Purchase Order was prepared by [the supplier], acceptance in this instance would mean nothing more than receipt of the executed document in its office." *Id.,* 273 S.E.2d at 558. Here, by contrast, neither party was preparing a bid for a project, the Agreement was not a purchase order, the Agreement contained spaces for both parties' signatures, and the requirement that Air Products accept the Agreement in Pennsylvania was repeated directly above the space provided for Air Products' signature. Thus, the holding in *J. B. Moore Electrical Contractor, Inc.* does not control here.

5. That section 2–204, and not section 2–206, is the controlling section is confirmed by official comment 7 to UCC § 2–207, Va. Code Ann. § 8.2–207 (Michie 1991). That comment states:

In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. See Section 2–204. The only question is what terms are included in the contract, and subsection (3) [of section 2–207] furnishes the governing rule.

Va.Code Ann. § 8.2–207 official cmt. 7 (Michie 1991).

6. It is therefore unnecessary for us to reach Air Products' contention that a contract came into being in September when the Agreement was ratified at Air Products' home office.

Agreement of June 26th, including the Attachment, constituted the terms of the contract between the parties.

### III.

In a footnote, the district court raised, *sua sponte*,[7] the issue of whether the contract as formed violated the relevant Statute of Frauds, UCC § 2–201(1), Va.Code Ann. § 8.2–201(1) (Michie 1991).[8] However, the court reasoned that Air Products' part performance took the contract out of the Statute of Frauds under UCC § 2–201(3)(c), which provides: "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable ... with respect to goods for which payment has been made and accepted or which have been received and accepted...." Va.Code Ann. § 8.2–201(3)(c) (Michie 1991). The district court then awarded Air Products the damages it sought. Wells Water argues that the district court erred because the part performance exception provided by section 2–201(3)(c) saves only part of the contract. Specifically, damages are limited to the extent of part performance.

■ We need not address Wells Waters' argument, however, because we conclude that the Statute of Frauds has no application here. The applicable Statute of Frauds provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker....

Va. Code Ann. § 8.2–201(1) (Michie 1991). Here, there is a written agreement signed by Wells Waters' President, and Wells Waters is the party, for purposes of Air Products' counterclaim, against whom enforcement is sought. Section 2–201(1), by its terms, does not bar the enforcement of the contract against Wells Waters provided that the writing "indicate[s] that a contract for sale has been made between the parties...." *Id.*

A question arises as to whether a writing may satisfy UCC § 2–201(1) when it was made before the contract was formed. The use of the present perfect tense, "has been made," makes it at least arguable that, to satisfy section 2–201, the writing must have been made at the time or after a contract had already been formed.

The Seventh Circuit addressed this problem in *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1182–83 (7th Cir.1991). That court, in an opinion authored by Judge Posner, concluded, albeit apparently in *dicta*, that, in a situation such as the one presented here, UCC § 2–201 does not bar enforcement of the contract. The Seventh Circuit first identified three distinct classes of cases. The first class consists of cases where "the precontractual writing is merely one party's offer." *Monetti, S.P.A.*, 931 F.2d at 1182. The second includes those cases where the precontractual writing consists of "notes made in preparation for a negotiation session...." *Id.* The third class consists of those cases "where the precontractual writing ... indicates the promisor's ... acceptance of the promisee's ... offer; the case, in other words, where all the essential terms are stated in the writing and the only problem is that the writing was prepared before the contract became final." *Id.* The case at bar clearly falls within the third class of cases.

The *Monetti, S.P.A.* court noted that to hold that writings that fall within the first class of cases satisfy UCC § 2–201 would present the "acute danger that a party whose offer had been rejected would nevertheless try to use it as the basis for a suit,"[9] 931

---

7. Neither party objects to the raising of the Statute of Frauds *sua sponte* by the district court.

8. The official comment to UCC § 2–204 confirms that UCC § 2–201 applies in cases where contract formation takes place under section 2–204: "The legal effect of ... an agreement [that comes into being under the terms of section 2–204] is,

of course, qualified by other provisions of this Article." Va.Code Ann. § 8.2–204 official cmt. (Michie 1991).

9. We do not believe that this statement accurately presents the danger that a holding that writings in the first class of cases satisfy section 2–201(1) would create: a party cannot normally

F.2d at 1182, and that, in a case falling within the second class of cases, the writing should not be held to satisfy the section, "lest a breakdown of contract negotiations become the launching pad for a suit on an alleged oral contract," *id.* Indeed, contrary conclusions with respect to these two classes of cases would vitiate much of section 2–201, leaving it applicable virtually only in cases where there is *no* writing whatsoever.

A holding that writings that fall within the third class of cases satisfy section 2–201 does not, by contrast, raise these concerns. *See Axelson, Inc. v. McEvoy–Willis,* 7 F.3d 1230, 1233 n. 6 (5th Cir.1993).[10] Indeed, as the Seventh Circuit noted, "under a general statute of frauds, 'it is well settled that a memorandum satisfying the Statute may be made before the contract is concluded.'" *Monetti, S.P.A.,* 931 F.2d at 1183 (quoting *Farrow v. Cahill,* 663 F.2d 201, 209 (D.C.Cir.1980)).

The Seventh Circuit would immediately have concluded that section 2–201 has no application in the third class of cases but for the use of the present perfect tense in the statute. *See id.* at 1182–83. The court of appeals cited two cases in which the use of the present perfect tense in section 2–201 had been held to bar enforcement of a contract where the writing predated formation of the contract. *Id.* at 1183 (citing *Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir.1986), and *American Web Press, Inc. v. Harris Corp.,* 596 F.Supp. 1089, 1093 (D.Colo.1983)). The Seventh Circuit nevertheless concluded that section 2–201 was no bar, at least in the third class of cases, reasoning:

> ... [W]hile merely because the UCC's draftsmen relaxed one requirement of the [general] statute of frauds—that there be a writing containing all the essential terms of the contract—doesn't exclude the possibility that they wanted to stiffen another, by excluding writings made before the contract itself was made, the choice of tenses is weak evidence. No doubt they had in mind, as the typical case to be governed by section 2–201, a deal made over the phone and evidenced by a confirmation slip. They may not have foreseen a case like the present one, or provided for it. The distinction between what is assumed and what is prescribed is critical in interpretation generally.

In both of the decisions that we cited for the narrow interpretation, the judges' concern was with our first two classes of case; and judicial language, like other language, should be read in context. *Micromedia* involved an offer; in *American Web,* negotiations were continuing. We agree with Professor Farnsworth that in appropriate

make an offer and then, upon rejection of the offer, bring suit and rely upon the rejected offer to satisfy section 2–201(1), because the offer is not signed by the adverse party, *i.e.,* the party "against whom enforcement is sought." We believe that the real danger presented by such a holding to the first class of cases is similar to the danger such a holding presents to the second class, that is, the possibility that "a breakdown of contract negotiations [may] become the launching pad for a suit on an alleged oral contract," 931 F.2d at 1182. *See Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 234 (5th Cir. 1986). *But see infra* note 11.

**10.** In *Axelson, Inc. v. McEvoy–Willis,* the parties had exchanged writings which arguably, standing alone, created a contract. The Fifth Circuit concluded that, even if the writings did not create a contract, a contract had arisen under the Texas version of UCC § 2–207(3), Tex.Bus. & Com. Code Ann. § 2.207(c), by virtue of the parties' conduct. (As we discuss above, it is perhaps more accurate to state that contract formation occurred pursuant to UCC § 2–204(1),

with UCC § 2–207(3) providing the terms of the contract.) In a footnote, the court dismissed the possibility that, because the writings in question predated formation, the Texas version of UCC § 2–201(1), Tex.Bus. & Com. Code Ann. § 2.201(a), could bar enforcement of the contract:

> The statute of frauds does not present a problem. The statute only requires (1) "some writing sufficient to indicate that a contract for sale has been made," (2) a signature (in a loose sense), and (3) a quantity term. "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Tex.Bus. & Com. Code Ann. § 2.201(a) & cmt. 1 (West 1968). There can be no dispute that the writings, although they may not form a contract themselves, indicate that a contract for sale was made. The concerns of the statute of frauds are different from those of § 2.207, and the situation that the statute of frauds protects against is not present here.

*Axelson, Inc.,* 7 F.3d at 1233 n. 6 (citation omitted).

circumstances a memorandum made before the contract is formed can satisfy the statute of frauds, 2 [E. Allan Farnsworth,] *Farnsworth on Contracts* ... § 6.7, at p. 132 and n. 16, including the UCC statute of frauds.

*Id.*

We agree with the conclusion of the Seventh Circuit in *Monetti, S.P.A.* and note that the language of the statute is not inconsistent with the interpretation suggested by that court. The UCC drafters employed the *present* perfect tense, "has been made," and not the *past* perfect tense, "had been made." Although the use of the present perfect tense cannot be said to be unambiguous, use of the past perfect tense would be; its use would clearly preclude the holding we today adopt. That the UCC drafters did not employ the past perfect tense at the least lends support to Judge Posner's observation that, in all likelihood, the drafters simply did not foresee cases such as the one at bar.

We are satisfied that the Agreement meets the requirements of section 2–201(1). *Monetti, S.P.A.*, 931 F.2d at 1182–83. There can be no question but that the Agreement, signed as it was by both parties, and containing all material terms, clearly indicates a strong likelihood that a contract would be formed. *See Axelson, Inc.*, 7 F.3d at 1233 n. 6 ("There can be no dispute that the writings, although they may not form a contract themselves, indicate that a contract for sale was made.").[11] The contract is fully enforceable against Wells Waters and Wells Waters makes no claim that the district court otherwise erred in calculating damages.

## IV.

For the foregoing reasons, the district court's judgment in favor of Air Products is

*AFFIRMED.*

---

11. Focusing on the word "indicate" in section 2–201(1) supports the conclusion that writings that fall within the first two classes set out by the Seventh Circuit in *Monetti, S.P.A.* will generally be insufficient to satisfy that section, in contrast to writings that fall within the third class. Neither a mere offer signed by the offeror nor signed notes made in preparation for a negotiation session normally "indicate" a likelihood that a contract will be formed in the future. Both generally indicate merely that contract negotiations may have been undertaken. *See American Web Press, Inc.*, 596 F.Supp. at 1093. We note, however, that this conclusion appears to conflict with our holding in *Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1280–81 (4th Cir.), cert. denied, 484 U.S. 823, 108 S.Ct. 86, 98 L.Ed.2d 48

(1987). In that case, where a buyer sued a seller for breach of contract, we found, without engaging in much analysis, that the seller's written sales brochures, given to the buyer prior to the alleged formation of an oral contract, were sufficient to satisfy Va.Code Ann. § 8.2–201. *See* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 6.7, at 132 & n. 16 (1990) (suggesting a rule, broader than the rule devised by the Seventh Circuit in *Monetti*, under which "[a]n offer, which necessarily precedes the time of formation, may suffice" to satisfy the statute of frauds). We need not address this potential conflict, however, and decline to do so. *See Monetti, S.P.A.*, 931 F.2d at 1183 (noting broader rule proposed by Farnsworth, but declining to comment on its viability).