CARL A. HAAS AUTOMOBILE
IMPORTS, INC., Plaintiff,

v.

LOLA CARS LIMITED, Defendant.

No. 96 C 1711.

United States District Court,
N.D. Illinois,
Eastern Division.

July 26, 1996.

Alan H. Silberman, David L. Schiavone and Kenneth G. Kolmin of Sonnenschein Nath & Rosenthal, Chicago, IL, and Aaron E. Hoffman of Schwartz & Freeman, Chicago, IL, for Plaintiff.

Walter C. Carlson and Bruce M. Zessar of Sidley & Austin, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Carl A. Haas Automobile Imports, Inc. ("Haas") has brought a four-count Complaint against Lola Cars Limited ("Lola")—the counts are successively captioned "Promissory Estoppel," "Breach of Contract," "Illinois Franchise Disclosure Act"[1] and "Fraud"—in

---

1. Citations to that statute (815 ILCS 705/1 to 705/44) will take the abbreviated form "Act § ——," omitting the "815 ILCS 705/" designation.

connection with Lola's termination of Haas as the exclusive North American distributor of Lola's race cars and parts. Lola has moved for dismissal of the Complaint under Fed.R.Civ.P. ("Rule") 12(b)(6), and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Lola's motion is granted in part and denied in part.

### Rule 12(b)(6) Standards

■■■ Familiar Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded factual allegations, together with all reasonable inferences in Haas' favor (*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429–30 (7th Cir.1996)). Dismissal is appropriate only if it appears beyond doubt that Haas can prove no set of facts, consistent with the Complaint's allegations, that would entitle it to relief (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)).[2] Hence the following *Facts* section credits Haas' allegations in their entirety (all references to the Complaint are simply "¶——," while its exhibits are cited "Ex. ——").

### Facts

Lola is an English company that designs and manufactures race cars and parts (¶ 2). Since 1967 Illinois corporation Haas has been Lola's exclusive North American distributor (¶¶ 1, 6–7). While from time to time Lola and Haas have operated under written contracts, from the time that the last written agreement expired on October 31, 1990 until Lola terminated Haas (effective at the end of the 1996 racing season, ¶ 33) Haas has distributed Lola cars "under a series of agreements which are oral and implied by the parties' course of dealing" (¶ 9).

### Indy Car Distributorship

One of Lola's major products is the "Indy" race car ("Indy car"), a high-performance car designed for an annual series of races including the Indianapolis 500 (¶ 8).[3] As Lola's Indy car distributor (¶ 10, quoted verbatim):

a. Haas has purchased and arranged the sale and delivery of racing cars;

b. Haas has purchased and maintained a comprehensive inventory of racing car spare parts and has sold spare parts;

c. Haas has regularly solicited purchasers and prospective purchasers of Indy cars to obtain orders;

d. Haas maintains a full-time sales and support force for race cars and parts consisting of approximately 19 people, two of whom were added for the 1996 and subsequent race seasons;

e. Haas maintains a full-service warehouse facility designed to allow it to fulfill its distributorship obligations;

f. Haas has sent specially built and equipped semi-trailers carrying spare parts and equipment to each scheduled Indy car racing event (including practice and qualifying sessions), and has had its personnel available at those events to sell spare parts and provide consultation and advice to racing teams operating the Lola race cars;

---

**2.** Lola's R.Mem. 1 takes issue with the fact that Haas' responsive Memorandum had argued equitable estoppel, "a legal theory pleaded nowhere in its complaint" (D.R.Mem. 1). To be sure, such cases as *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) stand for the proposition that a plaintiff's brief cannot serve to amend its complaint in opposition to a motion to dismiss. But that speaks of a plaintiff's inability to expand on the complaint's *factual allegations*, something totally different from the situation posed here. Under the Rules a plaintiff can plead the right legal theory, the wrong legal theory or even no legal theory at all (*Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1077–78 (7th Cir.1992); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir.1992)) without impact-ing on the complaint's sufficiency. Hence Haas' purely voluntary and nondeterminative choice to structure its Complaint in terms of four separate counts (*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1992)) in no way limits it to those four specific legal theories.

**3.** Indy cars, sold exclusive of engines, retail for some $400,000 (¶ 8). Because of the enormously competitive nature of the races and the technological advancements from year to year, race teams order new cars each season (¶ 12). And due to the lead time required to manufacture the cars, race teams usually place their orders in the summer and early fall for the following calendar year's racing season (so teams will place orders as early as July 1996 for 1997 race cars) (¶ 13).

g. Haas acts as liaison between Lola and various racing teams to communicate information about Lola cars, and provides assistance in testing the cars; and

h. Haas has directed the Newman–Haas Racing Team, which is under partial common ownership with Haas, to work closely with Lola's engineers on improvements and modifications to the Lola Indy cars, and to provide engineering services which Lola uses in the development and manufacture of its race cars.

All of those services "were provided by Haas for Lola's benefit and at Lola's request, at no cost to Lola" (*id.*). Haas' efforts have been vital to the success of Lola's Indy cars (¶ 11).

*Haas' Reynard Opportunity*

In 1992 Reynard Racing Cars Limited ("Reynard") began to plan the introduction of a race car that would compete with Lola's Indy car (¶ 14). During 1992 and continuing until early May 1993, Reynard offered Haas the opportunity to be the exclusive North American distributor for the Reynard Indy car on a five- to ten-year basis beginning with the 1994 racing season (¶ 15). Reynard also offered Haas the opportunity to invest in Reynard's newly-planned Indy car venture (*id.*).

In May 1993 Haas advised Lola Chairman Eric Broadley ("Broadley") that it had an offer to become involved with a competitor and asked for Lola's assurance that Haas' Lola distributorship would continue (¶ 16). In response Broadley told Haas that it would indeed continue to be Lola's exclusive North American distributor of Indy cars for at least an additional five years (through 1998).[4] But as a condition to Haas' maintaining that long-term relationship with Lola, Broadley insisted that Haas had to terminate all of its existing relations with Reynard (¶ 18).[5] In reliance on Lola's promise Haas declined Reynard's offers, terminated its then-existing profitable relationship with Reynard and continued its diligent efforts to promote Lola cars, parts and related products (¶ 19).

*"Indy Lights" Car*

Since 1993 Lola has also produced and Haas has also exclusively distributed an "Indy Lights" race car—a car that resembles the Indy car but is slower, less sophisticated and less expensive and is driven in an annual series of Indy Lights races conducted throughout the United States (¶¶ 20, 23). As the result of extensive efforts on Haas' part with the primary promoter of the Indy Lights racing series, Patrick Racing, Inc. ("Patrick Racing"), Lola was designated to replace a competitor as the exclusive supplier of Indy Lights cars (¶ 22, 29).[6]

In consideration of the role that Patrick Racing had played in promoting the Indy Lights racing series and in selecting Lola as the exclusive supplier of cars, Lola required Haas to provide Patrick Racing (which also operates an Indy car team) with a substantial discount on Indy cars and parts (¶ 29). Although the benefit of Lola's selection as exclusive Indy Lights car supplier flowed predominantly to Lola, it required Haas to bear the entire cost of that discount (*id.*).

In an agreement that Lola executed in January and February 1993 ("1993 ARS agreement," Ex. A) with the governing body for the Indy Lights racing series, American Racing Series Incorporated ("ARS"), Lola

---

**4.** That assurance was repeated from time to time during 1994 (¶ 17). And in 1995, in conjunction with oral promises made by Lola assuring Haas' long-term distributorship of Lola's Indy Lights cars (discussed below), Lola promised that Haas' Indy car distributorship would also run through the year 2000 (¶¶ 17, 30).

**5.** That demand for Haas' cutting ties with Reynard was not simply a matter of Lola's possible concern about any potential conflicts of interest: Haas was already distributing some Reynard *products, an existing relationship that involved* products and markets in which Lola did *not* compete (¶ 19). And as early as May 1989 Lola had tried to require Haas to terminate distribu-

torship agreements with other race car manufacturers—specifically Reynard (¶ 18). In August 1995 Lola also encouraged Haas to hire John Syzmanski ("Syzmanski"), an employee of Reynard's Indy race car distributor Chip Ganassi ("Ganassi"), away from Ganassi. Haas complied with that "request and insistence" by hiring Syzmanski (¶ 32).

**6.** All of the cars in the Indy Lights racing series must be identical, so that the competition is then more dependent on the skill of the drivers. For that reason all of the Indy Lights cars come from a single producer (¶ 21).

acknowledged Haas as its "established distribution channel in the US" (Ex. A Art. 3.1; ¶ 24). Under that agreement Lola required Haas to pay ARS a fee of 10% of the invoice selling price of spare parts and $5000 of its profit on each race car sold, plus an additional 30% of its profit on race cars if the currency exchange rate ($ to £) fell below a specified level (Ex. A Arts. 2.3, 3.1, App. A; ¶¶ 24–25). Haas' President Carl Haas signed the 1993 ARS agreement on its behalf (Ex. A at 12; ¶ 26).

In a July 7, 1995 agreement between Lola and ARS ("1995 ARS agreement," Ex. B), also signed by Carl Haas (*id.* at 11), Lola again acknowledged Haas as its "established distribution channel in the USA" (*id.* Art. 2.1; ¶ 27). That agreement increased the fee payable by Haas to ARS on spare parts sales to 12.5% and upped ARS' share of Haas' profit on each race car sold to $8000, with a like provision for an additional 30% of profit geared to a low exchange rate (¶ 27).

While the specific terms of Haas' distributorship of the Indy Lights cars "have been based upon a series of oral agreements and a course of dealing between the parties," Haas has performed these services for Lola as to the Indy Lights cars (¶ 28, also quoted verbatim):

a. Haas has purchased and arranged the sale and delivery of race cars;

b. Haas has purchased and maintained a comprehensive inventory of racing car spare parts and has sold spare parts;

c. Haas has regularly solicited purchasers and prospective purchasers of Indy Lights race car to obtain orders;

d. Haas maintains a full-time sales and support force for race cars and parts, in addition to administrative, accounting and clerical personnel;

e. Haas maintains a full-service warehouse facility designed to allow it to fulfill its distributorship obligations;

f. Haas has sent specially built and equipped semi-trailers carrying spare parts and equipment to each scheduled Indy Lights racing event (including practice and qualifying sessions), and has had its personnel available at those events to sell spare parts and provide consultation and advice to racing teams;

g. Haas acts as liaison between Lola and various racing teams to communicate information about Lola cars, and provides assistance in testing the cars; and

h. Haas has already performed services necessary to obtain orders for the 1997 racing season and has obtained actual orders, all of which was known to Lola.

Haas' inventory of Lola parts is maintained at a level in excess of $2 million, purchased from Lola to fulfill Haas' distributorship obligations (¶¶ 28, 36).

In May 1995 Lola's Joint Managing Director Michael Blanchet ("Blanchet") expanded on and extended Lola's earlier promise to Carl Haas by assuring him that Haas would remain Lola's exclusive distributor for both Indy Lights and Indy cars through the year 2000 (¶ 30). That was the final word conveyed by Lola to Haas until the axe fell in December of that year.

*Lola's Termination of Haas*

As indicated by the preceding paragraph, following Broadley's May 1993 promise "Lola continued to deal with Haas in a manner consistent with the existence of à long-term distributorship relationship" (¶ 31). But in December 1995 Lola notified Haas (Ex. D) that it was terminating the distributorship relationship effective at the end of the 1996 racing season (¶ 33; C. Ex. D). Lola did not claim that the termination was for cause (¶ 34)—instead ¶ 35 alleges:

Rather the termination is solely the result of Lola's belief that with the benefit of the market acceptance built up for its products by Haas over the past 29 years, it can now handle the distribution function in-house at a lower cost and greater profit to itself.

*Fraud Allegations*

As stated at the outset of this opinion, Complaint Count IV sounds in fraud. In that respect Haas also alleges (¶¶ 55–60):

55. Beginning as early as 1992, Lola had asked Haas to reduce its profit margin on Indy car chassis and parts to help Lola remain competitive. Haas acceded to that request.

56. Beginning with orders for the 1994 racing season, which were being taken in the last quarter of 1993, Lola began to suffer increasing pressure by reason of increased competition for the supply of Indy race cars. That pressure caused Lola's profit margin to decrease.

57. On information and belief, beginning at a point not known to Haas but now believed to have been in 1994, Lola reached the conclusion that it would terminate Haas' distributorship, believing that it could exploit the market which Haas had developed for Lola race cars with an in-house sales effort at a lower cost to it.

58. Notwithstanding that decision, Lola failed to advise Haas that its distributorship would be terminated, and affirmatively led Haas to believe that its distributorship would be continued.

59. In reliance upon Lola's failure to advise it of the impending termination, and affirmative misleading of it, Haas continued to purchase parts from Lola, hired additional personnel, and did not take steps to find alternative sources to sustain its business.

60. Lola intended that Haas rely upon its failure to advise Haas of the impending termination, and upon the affirmative misleading of Haas by Lola, and Haas did so reasonably and foreseeably rely.

*Breach of Contract—Statute of Frauds*

Haas' claim for breach of contract is based on the promises made on Lola's behalf by Broadley in 1993 (that Haas would continue to be Lola's exclusive North American distributor of Indy cars for at least an additional five years, or through 1998) and then by Blanchet in 1995 (that Haas would remain as Lola's exclusive distributor of both Indy and Indy Lights cars through the year 2000). But (at least initially) any such oral promises run headlong into at least one and perhaps two statute of frauds provisions.

Most directly, the oral promises are literally rendered unenforceable by the one-year provision of 740 ILCS 80/1. It reads:

No action shall be brought . . . to charge any person . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

*Hammond Group, Ltd. v. Spalding & Evenflo Cos.*, 69 F.3d 845, 849 (7th Cir.1995) confirms the applicability of that provision on a claim akin to Haas'.[7]

■ There is another possible route to the same destination. Illinois Uniform Commercial Code ("UCC") Art. 2 governs "transactions in goods" (810 ILCS 5/2–102), and distributorships are generally held to fall within the ambit of that language (see *American Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1385–86 (7th Cir.1995); *Sally Beauty Co. v. Nexxus Prod. Co.*, 801 F.2d 1001, 1005–06 (7th Cir.1986); see also this Court's opinion in *WICO Corp. v. Willis Indus.*, 567 F.Supp. 352, 355 (N.D.Ill.1983)). UCC Art. 2 contains its own statute of frauds (810 ILCS 5/2–201(1)):

Except as otherwise provided in this Section[8] a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Because there is nothing for Haas to gain by placing this case solely within the UCC,[9]

---

7. Lola has foreclosed Haas' potential resort to the judicial-admission exception to the statute of frauds by submitting sworn declarations by Broadley and Blanchet denying that they ever made the promises alleged in the Complaint (Broadley Decl. ¶ 6; Blanchet Decl. ¶ 3) (*DF Activities Corp. v. Brown*, 851 F.2d 920, 922–24 (7th Cir.1988)).

8. [Footnote by this Court] Those statutory exceptions are plainly inapplicable here.

9. As the ensuing discussion will show, Haas (1) would not benefit from the UCC's less demanding statute of frauds, (2) cannot avail itself of the UCC's limited part performance exception and (3) cannot rescue its promissory estoppel claim by seeking refuge under the UCC.

**1388**

however, this opinion need not decide whether the UCC's statute of frauds (either alone or together with the general Illinois statute of frauds) even applies to this case (see the discussion in *Monetti, S.P.A. v. Anchor Hocking Corp.,* 931 F.2d 1178, 1181–86 (7th Cir.1991)).

 Haas attempts to avoid the applicability of the statute of frauds by pointing to the 1993 and 1995 ARS agreements (Exs. A and B) as purported written evidence of the existence of a long-term exclusive distributorship agreement (P.Mem. 8–9). In the 1993 ARS Agreement Lola undertakes to (Ex. A Art. 3.1; see also *id.* Art. 2.1):

> Supply Spare Parts via .Haas being LOLA's established distribution channel in the US during the currency of this Agreement and during the currency of the present distributorship agreement between LOLA and Haas.

And in the 1995 ARS Agreement Lola pledges to (Ex. B. Art. 1.2; see also *id.* Arts. 2.1, 3.1):

> Ship the Cars by sea freight to LOLA's established distribution channel in the U.S.A., which shall be Carl A. Haas Automobile Imports Inc. ("Haas") ... during the currency of the present distributorship agreement between LOLA and Haas....

 To satisfy the statute of frauds, writings "must contain the agreement's essential terms" (*Bower v. Jones,* 978 F.2d 1004, 1008 (7th Cir.1992)), a requirement that is clearly not met by the ARS Agreements in terms of spelling out the terms of—or even the existence of—a long-term Lola/Haas agreement.[10] On the contrary, each agreement's reference to "during the currency of the present distributorship agreement between Lola and Haas"—a period undefined in either ARS Agreement—demonstrates the total circularity of any attempt to rely on those contracts alone. For aught that appears there, Lola was free to terminate the distrib-

utorship on the very next day after either ARS Agreement was signed.

### Part Performance

 Haas fares a good deal better—at least as to part of its breach-of-contract claims—in wriggling out of the grasp of the statute of frauds by invoking the doctrine of part performance. As 2 E. Allan Farnsworth, *Farnsworth on Contracts* ("*Farnsworth*") § 6.9, at 155 (1990) explains that doctrine:

> As a general rule, part performance does not make a contract within the statute enforceable, though the performing party may have a claim based on restitution or reliance. In a few exceptional situations, however, part performance removes the bar of the statute, at least to some extent. These exceptions are based on the premise that part performance affords reliable evidence of an agreement.

That part performance doctrine applies when a contracting party, in reliance upon an oral agreement that is otherwise within the statute of frauds, has performed something that is both substantial and required by that agreement—performance that is clearly more consistent with the existence of the agreement than with some other arrangement—and (*Payne v. Mill Race Inn,* 152 Ill.App.3d 269, 277–79, 105 Ill.Dec. 324, 330–31, 504 N.E.2d 193, 199–200 (2d Dist.1987)):

> when the performance is such that it is impossible or impractical to return the performing party to the pre-performance status quo, or to compensate him for what he has parted with, or for the value of his performance. In such a case, allowing the defendant to deny the bargain would be a virtual fraud upon the performing party.

Among other cases to the same effect, see also (*Gibbons v. Stillwell,* 149 Ill.App.3d 411, 415–17, 102 Ill.Dec. 864, 867–68, 500 N.E.2d 965, 968–69 (5th Dist.1986)).[11] Thus, in a

---

**10.** Interestingly, the 1993 ARS Agreement was fully executed by the early part of February 1993—*before* Broadley made Lola's first promise of a long term Lola–Haas deal.

**11.** Lola contends that the partial performance doctrine is unavailable to Haas because it seeks the legal remedy of money damages, and because

the doctrine applies in equity and not at law (see, e.g., *Cohn v. Checker Motors Corp.,* 233 Ill.App.3d 839, 845, 175 Ill.Dec. 98, 103, 599 N.E.2d 1112, 1117 (1st Dist.1992) as well as *Gibbons*). But federal practice permits a party to request alternative and even inconsistent grounds for, or types of, relief (Rule 8(e)(2); see, e.g., *Pasant v.*

case where (1) a party's act of performance serves as good evidence that there was a contract and (2) the party will be left out in the cold in terms of an available remedy for its reliance, the court should remove the bar of the statute of frauds to permit proof and enforcement of the contract (see *Monetti*, 931 F.2d at 1183–84).[12]

■ Most of the claimed part performance suggested by Haas (P.Mem. 8) does not trigger the operation of the doctrine as to Lola's 1995 promise that Haas would have an exclusive distributorship on both the Indy race cars and the Indy Lights race cars until the year 2000. On that score what Haas urges as its claimed partial performance of that agreement for a future relationship really amounts to activity that Haas had long engaged in even without the promise of a long-term deal: selling cars and parts, taking orders, etc.[13] But no such prior unwritten contractual relationship, even though prolonged (here the parties had such an ongoing relationship for over 25 years), can of itself serve as the kind of assurance of its continuation that the part performance doctrine demands.[14] In that respect the present situation is analogous to cases in which the statute of frauds is applied to bar the enforcement of

alleged contracts of long-term employment despite the fact that the employee has performed his or her duties for a period of time, sometimes a very long period indeed (see e.g., *Cherry Payment Sys., Inc. v. Rogers*, No. 92 C 5918, 1995 WL 584062 at *3–*6 (N.D.Ill. Oct. 3) and numerous cases cited there).

■ But the situation is very different indeed when it comes to the circumstances surrounding Broadley's May 1993 promise of a continued Indy race car distributorship. That promise was the direct outcome of Haas' advice to Lola that it had an offer of a firm long-term exclusive distributorship of the new Reynard entry into the Indy race car market, coupled with an opportunity for an equity investment in that Reynard venture. Broadley did not simply reject Haas' ability to take advantage of those opportunities concurrently with its continued Lola distributorship. Over and above that he required, as a condition of Haas' promised exclusive on Lola's cars through 1998, that Haas terminate its entire relationship with Reynard—a then-existing profitable relationship involving products and markets in which Lola did not compete. And Haas did exactly what Broadley demanded in ex-

---

*Jackson Nat'l Life Ins. Co.*, 768 F.Supp. 661, 662–63 (N.D.Ill.1991)). And although Haas' Count II breach of contract claim currently seeks specific performance (the paradigmatic equitable remedy) only as to the Indy Lights race car exclusive distributorship to the year 2000—a remedy that this section of the opinion goes on to find unavailable to Haas—the *Hishon* principle that favors every plaintiff targeted by a Rule 12(b)(6) motion would enable Haas to reshape its prayer for relief to fit the ruling announced here.

**12.** Under the UCC the part performance of an agreement covered by the statute of frauds serves to take the agreement out of the statute only "with respect to goods for which payment has been made and accepted or which have been received and accepted" (810 ILCS 5/2–201(3)(c)). But that does not control the situation here. And although 2 *Farnsworth* § 6.9, at 161 observes that "there is no exception for a party's part performance of a contract within the one-year provision," such an across-the-board rule is a totally inaccurate statement of the Illinois law on part performance, which consistently recognizes the availability of the doctrine as an exception to 740 ILCS 80/1 (see, e.g., *Tabora v. Gottlieb Memorial Hosp.*, 279 Ill.App.3d 108, 120–21, 215 Ill.Dec. 870, 879, 664 N.E.2d 267, 276 (1st Dist.

1996); *Johnson v. George J. Ball, Inc.*, 248 Ill. App.3d 859, 866, 187 Ill.Dec. 634, 639, 617 N.E.2d 1355, 1360 (2d Dist.1993); *Davies v. Martel Lab. Servs., Inc.*, 189 Ill.App.3d 694, 698, 136 Ill.Dec. 951, 954, 545 N.E.2d 475, 478 (1st Dist. 1989); *Monetti*, 931 F.2d at 1183–84).

**13.** One possible exception to that characterization would obviously be Haas' making of a term commitment that would not have been entered into but for the Lola promise—for example, if Haas' hiring of Syzmanski at Lola's behest (see n. 5) had been under a contract for years and was not needed by Haas except to service its Lola-related business. But the Complaint has not said (or implied) anything of that nature.

**14.** If the 1995 ARS–Lola contract (which Lola required that Haas also sign) had contained better language evidencing Lola's commitment to Haas, the answer here would be different. But as explained earlier, that contract spoke only of Haas being Lola's "established distribution channel in the U.S.A. ... during the currency of the present distributorship agreement between LOLA and Haas"—language that has no internal assurance as to the continued duration of that distributorship agreement.

change for the latter's promise of a firm multiyear relationship.[15]

That is precisely the kind of scenario of which *Monetti*, 931 F.2d at 1183 spoke when it said:

> This partial performance took the contract out of the general Illinois statute of frauds. Unilateral performance is pretty solid evidence that there really was a contract—for why else would the party have performed unilaterally? Almost the whole purpose of contracts is to protect the party who performs first from being taken advantage of by the other party, so if a party performs first there is some basis for inferring that he had a contract.

Accord, the decision (quite similar as a legal matter) in *Payne*, 152 Ill.App.3d at 277–79, 105 Ill.Dec. at 330–31, 504 N.E.2d at 199–200.[16] And the same conclusion is further fortified by the fact that Lola had tried unsuccessfully to get Haas to terminate its relations with Reynard as early as May 1989—Lola was able to accomplish that result only when it coupled its renewal of that effort with the promise to Haas of a long-term distributorship.

In sum, Haas' allegations (which must be accepted as true at this stage[17]) present a classic case for triggering the operation of the part performance doctrine to enforce Lola's May 1993 promise.[18] But as stated earlier, at least on the present allegations this Court sees no basis for applying the same doctrine to enforce Blanchet's 1995 promise to extend both the Indy car and Indy Lights distributorships through the year 2000.

*Promissory Estoppel*

■ Illinois courts have rejected the notion that the doctrine of promissory estoppel (unlike the concept of equitable estoppel discussed below) can rescue a claim based on promises that would otherwise be barred by the statute of frauds (see *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227, 1231 (7th Cir.1995), citing *First Nat'l Bank v. McBride Chevrolet, Inc.*, 267 Ill.App.3d 367, 373, 204 Ill.Dec. 676, 680, 642 N.E.2d 138, 142 (4th Dist.1994) and *Dickens v. Quincy College Corp.*, 245 Ill.App.3d 1055, 1062, 185 Ill.Dec. 822, 827, 615 N.E.2d 381, 386 (4th Dist.1993); *Cohn*, 233 Ill.App.3d at 845–46, 175 Ill.Dec. at 103, 599 N.E.2d at 1117). Haas seeks to dodge that result by urging that it does not apply in cases governed by the UCC. But that contention assumes (1) that only the UCC's statute of frauds—and not the one-year provision of the general statute of frauds—is in play here and (2) that Illinois courts do—or would—draw a distinction between non-UCC cases (no promissory estoppel claim allowed) and UCC cases (promissory estoppel claim allowed).

■ As indicated earlier, Haas' first assumption is at odds with the express language of 740 ILCS 80/1 (the general statute of frauds). And Haas' second assumption is unfounded as well. Until recently our Court of Appeals had issued mixed signals as to whether promissory estoppel would fly in a UCC case (see *Monetti*, 931 F.2d at 1186, chronicling the wavering line of prior precedents). But now *Architectural Metal*, 58 F.3d at 1231—a case applying the Illinois

15. As part of its required severance from Reynard, Haas gave up not only its preexisting relationship but also the opportunity for an equity investment and a long-term exclusive distributorship. That is further probative of the making of a firm commitment by Lola to induce Haas to pass up those opportunities.

16. In terms of the "pre-performance status quo" referred to in this opinion's earlier quotation from *Payne*, that was the situation when Haas still had open to it the full range of opportunities that had been offered by Reynard. In those terms, in the language of *Payne*, clearly "it is impossible or impractical to return" Haas to that position.

17. This is not inconsistent with n. 7. Though Broadley's and Blanchet's denials of Haas' version of the relevant events can succeed in avoiding the judicial-admission exception to the statute of frauds, those denials cannot be taken into account on the issue now being considered.

18. In terms of Haas' entitlement to equitable relief, the nature of its performance—the termination of an existing contractual relationship and the forgoing of the opportunity for other relationships with a third party, each posing obvious difficulties in quantification—would render futile the prospect of an action at law against Lola for restitution.

UCC—has expressly proclaimed "that the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel." This Court accepts the quoted language as an accurate statement of current Illinois law.[19] Haas' promissory estoppel claim is dismissed.

### Equitable Estoppel and Fraud

Both equitable estoppel and fraud are theories of recovery that require proof of at least some sort of misrepresentation. Accordingly they will be discussed together here.

■■■■■ "Equitable estoppel is a recognized exception to the statute of frauds" (*Bradley Real Estate Trust v. Dolan Assocs. Ltd.*, 266 Ill.App.3d 709, 713, 203 Ill.Dec. 582, 585, 640 N.E.2d 9, 12 (1st Dist.1994), citing *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill.2d 133, 148, 102 Ill.Dec. 379, 385, 500 N.E.2d 1, 7 (1986)). Illinois courts apply equitable estoppel on a showing of these elements (*M.J. Oldenstedt Plumbing Co. v. Kmart Corp.*, 257 Ill.App.3d 759, 764, 195 Ill.Dec. 906, 910, 629 N.E.2d 214, 218 (3d Dist.1994), citing *Vaughn v. Speaker*, 126 Ill.2d 150, 162–63, 127 Ill.Dec. 803, 808, 533 N.E.2d 885, 890 (1988) as to the doctrine's ingredients):

> (1) words or conduct of the party against whom estoppel is alleged, constituting either misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom estoppel is asserted that the representations were untrue; (3) the party claiming the benefit of estoppel must not have known the representations were false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting estoppel; (5) the party

claiming the benefit of estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of estoppel must be in a position of prejudice if the party against whom estoppel is alleged is permitted to deny the truth of the representations made. Fraudulent intent is not necessary to estoppel.

As *Ceres Illinois,* 114 Ill.2d at 148, 102 Ill. Dec. at 385, 500 N.E.2d at 7 has explained in that last respect (omitting its citations to, but not its quotations from, *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.*, 118 Ill. App.3d 754, 763, 74 Ill.Dec. 216, 222, 455 N.E.2d 246, 252 (2d Dist.1983)):

> To invoke the doctrine of estoppel the representation or conduct need not be "fraudulent in the strict legal sense or done with an intent to mislead or deceive." Rather, the test is "whether in all the circumstances of the case conscience and [the] duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct."

■■■■ As for any claim of actual fraud, that too must of course rest on alleged promises and assurances by Lola. Such a claim immediately sets off alarm bells, for "[i]n Illinois, a statement of future intention cannot generally be the basis of a claim of fraud because alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct" (*Bradley Real Estate Trust,* 266 Ill.App.3d at 713–14, 203 Ill.Dec. at 585–86, 640 N.E.2d at 12–13). But things are not as simple as that proposition would suggest: There is an exception to that general prohibition of "promissory fraud" where the misrepresentations are a part of a "scheme to defraud" (*Id.*).

■■■■ What constitutes such a "scheme"? Good question (see the cases and law review article cited in *Desnick v. American Broadcasting Cos.,* 44 F.3d 1345, 1354 (7th Cir.

---

19. Haas characterizes the quoted statement as dictum. Perhaps *Architectural Metal* might have assumed purely arguendo (without deciding) that a promise claimed to be enforceable under the doctrine of promissory estoppel must satisfy the UCC's statute of frauds, because in any event the case did involve writings sufficient to do so. But the Court of Appeals did not do that—instead it stated its view as quoted in the text, then applied the statute. This Court will eschew any theoretical discussion as to whether the quoted language is part of the case's actual holding or is instead dictum. It is enough to say that Haas has advanced *no* Illinois authority contrary to *Architectural Metal,* and this Court could find none—so there is no good reason to disclaim what is said there.

1995) as exemplary of its statement that "[t]he distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge"). On the one hand, "mere assertions that, at the time it made the representations, the defendant had no intention to later follow them, cannot be sufficient to state a cause of action for fraud; otherwise every breach of contract claim could also be a fraud claim" (*Tibor Machine Prod., Inc. v. Freudenberg–Nok Gen. Partnership*, No. 94 C 7635, 1996 WL 99896, at \*5 (N.D.Ill. Feb. 29)). But on the other hand, if those assertions are coupled with an allegation that the intentionally false promises were made with an intent to induce reliance, that suffices to state a cause of action (see *Bower*, 978 F.2d at 1011–12).

■ Against that legal backdrop, the evaluation of Haas' claims of equitable estoppel or fraud requires a fresh look at Haas' factual allegations. And for that purpose it is useful to set out the timing of the critical events and representations:

May 1993: Broadley told Haas that Haas would continue to be Lola's exclusive North American distributor of Indy cars for at least an additional five years. Broadley also required that Haas terminate all existing relations with Reynard as a condition to maintaining a long-term relationship with Lola. In reliance Haas declined the valuable Reynard opportunities and totally ended its relationship with Reynard.

Throughout 1994: Lola reiterated its assurance that Haas would be Lola's exclusive Indy car dealer through 1998. Despite that assurance, at some point in 1994 Lola reached the conclusion that it would earlier terminate Haas' distributorship.

May 1995: Well after Lola's intention of an earlier termination had jelled, Blanchet

still stated that Haas would remain as Lola's exclusive distributor for both Indy and Indy Lights race cars through the year 2000.

So far as Haas knows at this point, then, Lola required Haas to cancel its relationship with Reynard *before* Lola decided to terminate Haas' distributorship. Thus, the only basis for a potential misrepresentation (the gravamen of both equitable estoppel and fraud) centers on Lola having assured Haas (throughout 1994 and in May 1995) that it would continue to be Lola's exclusive distributor on a long-term basis—assurances given despite the knowledge that they would not be honored.[20]

It is more than a fair inference that Lola made deliberately false promises in 1994 and 1995 with the intention that Haas would be induced to continue to act for Lola's benefit. During that time frame Lola continued to represent to Haas that it would enjoy a long-term distributorship, intending that Haas rely on those representations while at the same time concealing from Haas its own plan to cancel the distributorship. Deceived by those misrepresentations, Haas conducted itself in reliance on Lola's false assurances.[21]

That is surely enough to qualify as a "scheme to defraud," thus allowing Haas to dodge the Rule 12(b)(6) bullet on part of its fraud claim. And as for equitable estoppel, Haas must also survive the present motion to the same extent—it is impossible to conceive that the "conscience and [the] duty of honest dealing" standard (*Ceres Illinois*, 114 Ill.2d at 148, 102 Ill.Dec. at 385, 500 N.E.2d at 7) is not met by such allegations that satisfy the "scheme" exception to promissory fraud.

### Franchise Claim

■ Act § 3(1) defines a "franchise" as a "contract or agreement, either expressed or implied, whether oral or written," under which (*id.*):

---

20. By contrast, no claim of fraud or equitable estoppel can be predicated on the earlier-mentioned May 1993 demand by Lola that Haas terminate its relations with Reynard as a condition to its maintaining a long-term relationship with Lola, even though Haas then acted in reliance by giving up the Reynard opportunity. On Haas' present allegations there is nothing to suggest that Lola was misrepresenting itself or concealing any information at that time.

21. This opinion need not get into the nature or extent of Haas' reliance: It has adequately pleaded that requirement.

(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and

(b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(c) the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $500 or more....

"If any element is not satisfied, then the franchise relationship is not satisfied" (*Mechanical Rubber & Supply Co. v. American Saw and Mfg. Co.*, 810 F.Supp. 986, 991 (C.D.Ill.1990), citing *Vitkauskas v. State Farm Mut. Auto. Ins. Co.*, 157 Ill.App.3d 317, 325–26, 109 Ill.Dec. 373, 379, 509 N.E.2d 1385, 1391 (3d Dist.1987)). It may well turn out, when all the facts are developed, that the Lola–Haas relationship did not fit the Act's definition. But at this pleading stage Haas has adequately alleged (and Lola does not challenge the adequacy of Haas' allegations as such[22]) the requisite elements of a franchise relationship (¶¶ 47–50).

Act § 19(a) states that it is a statutory violation "for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for 'good cause'...." Once a franchise relationship is found to exist, then, the statute imposes a "good cause" condition upon its termination.

Lola does not argue that Haas has insufficiently alleged the absence of good cause for termination. It rather contends that because there was no enforceable duration to the relationship between the parties, "the 'good cause' provision of the [Act] has no application because that provision *only* applies when a franchise agreement is terminated 'prior to the expiration of its term' " (D.R.Mem. 10–11; see also D.Mem. 7–8). If accepted, that proposition would mean that only franchise relationships with a fixed duration are subject to the statutory good-cause precondition to their termination.

That argument is not without force: If a franchise has no "term," it is difficult to conceptualize (other than in a metaphysical sense) how the franchisor's termination of that franchise can be premature—can be "prior to the expiration of its term." That reading, however, which would give the franchisor carte blanche to cut short the relationship "for good reason, bad reason, or no reason at all"[23] at any time—even the next day after the granting of the franchise— would cause the payment of the franchise fee (which is an integral part of the franchise definition under Act § 3(1)(a)) to be totally lacking in consideration.

In those terms it is not unreasonable to read the Act as establishing a bargain under which the franchisee pays the franchise fee in exchange for the modest condition that it will not be cut loose without "good cause." That reading contrasts sufficiently with the employer-employee situation, where the common law has not implied a good-cause-for-termination condition because of the theory (however harshly it may sometimes operate) that the employee has provided no consideration other than the rendition of current services for which current payment is made.

It can be seen that either construction of the Act has its difficulties. On balance and on the present assumed set of facts, however, a reading that gives substance to each side of the franchise bargain appears preferable.

This Court thus concludes—in a reading that is also in line with existing case

---

22. Lola contends that the Act cannot reasonably be construed to encompass the Lola–Haas relationship (D.Mem. 8–11; D.R.Mem. 11–15). That contention may ultimately prove persuasive, but for now the requirement that Haas' allegations must be credited—together with all reasonable favorable inferences—requires the rejection of Lola's position.

23. This language has been borrowed deliberately from judicial characterizations of the common law's at-will employer-employee relationship (see, e.g., *Ryherd v. General Cable Co.*, 124 Ill.2d 418, 427, 125 Ill.Dec. 273, 277, 530 N.E.2d 431, 435 (1988)).

law—that the Act's good cause termination requirement applies equally to the early termination of a fixed-term franchise agreement and to any termination of a franchise for an indefinite period (see *P & W Supply Co. v. E.I. Du Pont de Nemours & Co.*, 747 F.Supp. 1262, 1267–68 (N.D.Ill.1990) and *Flynn Beverage Inc. v. Joseph E. Seagram & Sons, Inc.*, 815 F.Supp. 1174, 1179–80 (C.D.Ill. 1993)[24]; see also the dictum in *Mechanical Rubber & Supply Co.*, 810 F.Supp. at 993). Haas' claim under the Act still stands.[25]

### Conclusion

Unlike Gwen Verdon's show-stopping song in the musical *Damn Yankees*, in this instance it is only partially true that "Whatever Lola wants, Lola gets." For the reasons stated at length in this opinion, (1) part of Haas' claim of breach of contract (as set out in Count II) and its entire claim of promissory estoppel (as set out in Count I) are barred by the statute of frauds and are therefore dismissed and (2) parts of Haas' Count IV fraud claim and its equitable estoppel theory of recovery are also dismissed, while (3) the other parts of Haas' breach-of-contract and fraud claims and of its assertion of the doctrine of equitable estoppel, together with its Count III claim under the Act, survive the present Rule 12(b)(6) motion to dismiss.

Lola is ordered to answer the Complaint (as limited in accordance with this opinion) on or before August 12, 1996. This action is set for a status hearing at 9 a.m. September 10, 1996.

---

**24.** Each of those two cases involved a franchise agreement lacking a fixed term, and subject to termination on 30 days' notice with or without cause. In each instance the court nevertheless looked to the Act to impose a "good cause" requirement for termination.

**25.** In accordance with the teaching of *Car Carriers*, this opinion will not address any potential Haas claims (as suggested at P.Mem. 12–13) for "failure to register" or "fraud or deceit" (under Act § 6) (covering fraudulent practices done "[i]n connection with the offer or sale of any franchise") unless and until Haas chooses to amend its Complaint to state a factual basis for those claims. It is also worth mentioning that because the Lola–Haas relationship has been in existence since 1967, there may be some potential retroactivity problems in applying the Act to it (see *Mechanical Rubber & Supply*, 810 F.Supp. at 991–93). That question too can await another day.