BENSDORF & JOHNSON,
INC., Plaintiffs,

v.

NORTHERN TELECOM LIMITED,
Defendant.

No. 99 C 673.

United States District Court,
N.D. Illinois,
Eastern Division.

July 13, 1999.

William M. McErlean, Howard L. Teplinsky, Seidler & McErlean, Chicago, IL, for plaintiffs.

Roger Pascal, Charles H.R. Peters, Lisa Ann Brown, Schiff, Hardin & Waite, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff, Bensdorf & Johnson, Inc., brings this three-count claim against defendant, Northern Telecom Limited, claiming that it suffered damage as a result of defendant's breach of an alleged distributorship agreement. Plaintiff alleges that defendant is liable for breach of contract (Count I); that defendant is liable in *quantum meruit* (Count II); and that defendant is liable for fraud (Count III). Defendant has moved to dismiss all three counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendant's motion is denied.

## BACKGROUND

In determining whether to grant defendant's motion to dismiss we accept plain-

tiff's well-pled factual allegations as true and resolve any ambiguity in plaintiff's favor. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). Viewing the parties' filings in such a light, the facts are as follows:

Plaintiff Bensdorf & Johnson, Inc. (B & J), an Illinois corporation, is a manufacturers' representative and distributor of electrical, fiber optic wire, cable and related products. B & J distributes its products to contractors and other users in the industrial, contracting, manufacturing and electrical utility sectors. Northern Telecom Limited (Nortel), a Canadian corporation, is a manufacturer of fiber optic switching and multiplexing equipment. In March 1994 Robert Bensdorf (Bensdorf), a principal of B & J, met Lee Lockwood (Lockwood), a regional sales representative of one of Nortel's subsidiaries, Prism Systems, at the Transmission and Distribution Show in Chicago. At the show, Lockwood introduced Bensdorf to a product being marketed by Nortel called "JungleMUX," a switch that multiplexes high-speed data transmission over fiber optic networks. Lockwood told Bensdorf that Nortel was interested in expanding the market for the switch into the local industrial and transportation businesses, a market with which Bensdorf had twenty years of experience. At that time Nortel had no presence in that local market.

Lockwood and Bensdorf agreed that B & J would work to create a market for JungleMUX, and in exchange B & J would be Nortel and Prism's exclusive distributor of JungleMUX to the anticipated CTA and Metra development projects. Lockwood agreed that when the CTA and Metra projects were put out for tender, B & J would be the only distributor quoted a price, the exclusive chain of supply would be honored and all contractors would be quoted a price for Nortel products from B & J. Lockwood also insisted, and Bensdorf agreed, that B & J would not seek to introduce or distribute to the CTA or Metra projects similar products by other manufacturers.

Shortly after the March trade show Bensdorf set up a meeting to introduce Lockwood to Marco Popovic, a representative of Knight and Associates Architects and Engineers, and Chris Kraker, a Metra representative. Bensdorf arranged for Lockwood to present Nortel's JungleMUX at that event. At some point after the meeting Michael Krumm, a Nortel employee, replaced Lockwood. Krumm met with Bensdorf at a meeting also attended by Walter Bensdorf, another B & J principal, and John Palmer, another Nortel employee. At that meeting Krumm represented that he would continue to honor the exclusive distribution agreement Bensdorf negotiated with Lockwood. On April 17, 1995, B & J confirmed the terms of the exclusive distribution agreement between B & J and Nortel in a letter sent to Michael Krumm (Cplt, Exh. A). The letter stated that B & J was acting as Nortel's exclusive distributor and listed projects that were underway, including the Metropolitan Rail public opening (the Metra project).

During the next year Bensdorf spent hundreds of hours working with personnel from Nortel and Metra in order to achieve product specification and eventually write an order. To this effect, Bensdorf introduced Krumm to Divane Brothers Electric, and electrical contractor that was planning on bidding for the electrical work on the Metra Project. In addition, during the development stage of the Metra project a Metra engineer proposed another manufacturer's solution for the project and B & J prepared an exhaustive study comparing the proposed solution with Nortel's JungleMUX. B & J also prepared a budget detailing the installed cost of using the product. While working on the Metra project B & J did not pursue opportunities on behalf of other manufacturers for similar work.

Early in the summer of 1996, Krumm repudiated the alleged contract with B & J and represented that he had not been authorized to enter into an agreement with B

& J. In the fall of 1997, Divane Brothers became the successful bidder on the Metra project. Their bid incorporated Jungle-MUX, which Nortel sold directly to Divane Brothers for approximately $2,000,000. B & J maintains that had it distributed the project to Divane Brothers it would have earned approximately $500,000 on the sale.

## ANALYSIS

The purpose of a motion to dismiss is to test the sufficiency of a complaint, not the merits of the action. *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583, 586 (7th Cir.1989), *cert denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Thus a complaint should not be dismissed for failure to state a claim "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On the other hand, in order to withstand a motion to dismiss the complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988). Generally, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985).

### Essential Contract Terms

■ In order to survive a motion to dismiss, a complaint based upon breach of contract must allege 1) the existence of a contract between plaintiff and defendant; 2) performance by the plaintiff of the conditions imposed on him by the contract; 3) breach of the contract by the defendant; and 4) damages resulting from the breach. *Payne v. Mill Race Inn,* 152 Ill.App.3d 269, 105 Ill.Dec. 324, 504 N.E.2d 193, 196 (2d Dist.1987). To allege the existence of the contract plaintiff must present facts indicating an offer, acceptance, and consideration. *Id.* In addition, for the contract to be binding and enforceable, the terms must be sufficiently definite and certain so that a court can determine what the agreement was and what conduct constituted a breach. *Kraftco Corp. v. Kolbus,* 1 Ill. App.3d 635, 274 N.E.2d 153 (4th Dist. 1971).

■ Nortel first argues that the terms of the exclusive distributorship agreement alleged by B & J are too vague and uncertain to give rise to an enforceable contract. Nortel relies on *Academy Chicago Publishers v. Cheever,* where the Illinois Supreme Court found that an alleged contract between a publisher and an author was unenforceable for vagueness due to lack of terms regarding parameters of work to be published, date of delivery, criteria for satisfactory performance by author, date of publication, type of publication to be used, or price at which book will be sold. 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981, 983 (1991). The *Academy* court ruled that a contract "is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Id.* Nortel also relies on *Magid Mfg. Co., Inc. v. U.S.D. Corp.,* 654 F.Supp. 325 (N.D.Ill.1987), where the court refused to enforce an oral distributorship agreement due to a lack of essential terms. There, the court observed that under Illinois law terms such as duration and sales quotas are considered essential terms of an agreement between manufacturer and a distributor. *Id.* at 332.

We begin by reiterating that in considering this motion to dismiss our task is to determine whether the facts alleged by plaintiff can be construed as setting forth any cognizable claim for relief. With this in mind we note that there are two possible contracts at issue here. On the one hand, plaintiff claims that the parties generally agreed that B & J would be Nortel's exclusive distributor for JungleMUX. Under the standards set forth above this claim clearly fails because there is no way for the court to determine the parameters of the alleged contract, such as the geographical area involved, anticipated dura-

tion of the relationship, means of termination, standards of performance, and other material terms. The lack of these terms is fatal to a general distributorship contract because it renders the contract unenforceable by making it impossible for the court to tell when a breach occurs. *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.*, 51 Ill.App.3d 11, 8 Ill.Dec. 78, 365 N.E.2d 316, 317 (3d Dist.1977).

■ However, the complaint can be construed as alleging another, more limited contract that we cannot so easily dismiss. B & J claims that at Nortel's request it agreed to use its energy and effort, regional transportation industry knowledge and expertise, and preexisting business relationships to get JungleMUX used on the Metra project, an agreement similar to a typical brokerage arrangement. B & J claims that it invested hundreds of hours in pursuit of this goal, set up meetings between Nortel and the parties bidding on the Metra project, prepared a cost analysis to be used by the electrical contractors in their bids, prepared a comparative study of JungleMUX and a competing product, which it presented to Metra representatives, and undertook numerous other steps to satisfy what it perceived as its part of the bargain. There is no reason for us to think that B & J acted gratuitously, and its letters to Nortel representatives clearly indicate that B & J expected payment in the form of earning a percentage or markup from being the middleman for JungleMUX on the Metra project. According to the complaint, Nortel had no business dealings with that market prior to Lockwood's meeting with Bensdorf, Bensdorf had extensive contacts in the relevant market, Bensdorf was aware of projects proposed by CTA and Metra, he introduced Nortel's people to various parties bidding on the Metra project and promoted Nortel's product through presentations, research and analysis. In the absence of some agreement it is difficult to see why B & J would bestow such a beneficial gratuity upon Lockwood, a party with whom it had no previous relationship. In short, if we accept the allegations of the complaint

as true it is difficult to escape the conclusion that B & J and Nortel agreed to work together towards the mutual goal of promoting JungleMUX for the Metra project and that neither party expected B & J to provide its services without compensation.

If we examine this more limited agreement, most of Nortel's objections fall away. No longer is it impossible to see to what the parties agreed (B & J's promotion of JungleMUX and Nortel's compensation of B & J by permitting B & J to distribute the product), the duration of the agreement (up to the bidding on the Metra project), and how the relationship would end (same). Although the parties did not agree on a fixed price for B & J's service, apparently because they anticipated that B & J would earn its profit from marking up JungleMUX before resale to the electrical contractor, the absence of that clause is not fatal. *Illinois Commerce Commission v. Central Illinois Public Service Co.*, 25 Ill.App.3d 79, 322 N.E.2d 520, 523 (4th Dist.1975) ("want of a stated price for the 'necessary electrical service' [does not] make the contract unenforceable, for if the price has not been determined the buyer must pay a reasonable price"). This is particularly true for brokerage contracts. *See Weisberg v. Century Intern. Foods, Inc.*, 1990 WL 115598, *3 (N.D.Ill.1990) (oral agreement between broker, who was in the business of obtaining meats from packers or slaughterhouses, and an exporter, who bought the meat from the broker and sold it overseas, was not unenforceable for want of a pricing term because under Illinois law commission can be determined by reference to customary rate) *citing John F. Fleming, Inc. v. Beutel*, 395 F.2d 21, 23 (7th Cir.1968) (under Illinois law there is an implied agreement to pay the usual and customary rate for similar transactions) *and Cole v. Brundage*, 36 Ill. App.3d 782, 344 N.E.2d 583, 601–02 (1st Dist.1976) (broker is entitled to a reasonable and fair payment for the services rendered). In short, if we view the complaint as alleging an agreement that B & J and Nortel would work together we may

no longer have a contract so vague that the court cannot ascertain the terms of the agreement. Accordingly, we think that it would be premature to dismiss B & J's contract claim at this time.

*Statute of Frauds*

■ Nortel next argues that any agreement between the parties is unenforceable under the Illinois Statute of Frauds because the alleged distributorship contract is one for the sale of goods and consequently cannot be enforced unless it was reduced to writing. The relevant statute provides:

> ... [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought ...

810 ILCS 5/2–201(1).

Under Illinois law a distributorship is generally considered a contract for the sale of goods. *See Spiering v. Fairmont Foods Co.*, 424 F.2d 337 (7th Cir.1970); *Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd.*, 933 F.Supp. 1381, 1388 (N.D.Ill. 1996); *Ryan v. Wersi Electronics*, 3 F.3d 174 (7th Cir.1993). Thus, the fact that the general distributorship agreement was not reduced to writing is fatal to that claim. As we discussed above, however, plaintiff's allegations can be read as alleging another agreement—B & J's agreement to use its business expertise to find a buyer for the JungleMUX product in the local transportation market. Although that arrange-

ment involves the transfer of goods, it also involves B & J's provision of a substantial service and more closely resembles a brokerage arrangement than it does a distributorship agreement. Brokerage contracts are primarily service-related, and thus the Statute of Frauds is usually inapplicable to such cases. *See, e.g., Edens View Realty & Inv., Inc. v. Heritage Enterprises, Inc.*, 87 Ill.App.3d 480, 42 Ill.Dec. 360, 408 N.E.2d 1069, 1075 (1st Dist.1980).[1]

■ Plaintiffs further argue that even if we accept Nortel's assertion that the Statute of Frauds applies, the doctrine of part performance prevents us from concluding that the contract is unenforceable. However, as Nortel correctly maintains, acts of partial performance will only remove an agreement from the operation of the Statute of Frauds when the enforcement action seeks the equitable relief of specific performance, and not the monetary damages sought in this case. *See Dickens v. Quincy College Corporation*, 245 Ill.App.3d 1055, 185 Ill.Dec. 822, 615 N.E.2d 381, 384 (4th Dist.1993). The Illinois cases discussing the issue make it clear that "part performance will only avoid the application of the Statute of Frauds where it is impossible or impracticable to return the performing party to the preperformance status quo, or to compensate him for what he has parted with, or for the value of his performance." *Cohn v. Checker Motors Corporation*, 233 Ill.App.3d 839, 175 Ill. Dec. 98, 599 N.E.2d 1112, 1116–17 (1st Dist.1992). In actions where the plaintiff seeks money damages, that is clearly not

---

1. We also note that the Statute of Frauds provision on which defendant relies contains an exception:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

810 ILCS 5/2–201(2). "Merchant" is defined in part as a "person who deals in goods

of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." 810 ILCS 5/2–104(1). According to the allegations in the complaint, this description fits both Nortel and B & J. Moreover, B & J's July 15, 1996 letter confirming the parties' agreement concerning the Metra project appears to satisfy the writing requirements of the merchant exception, and it is thus questionable whether the writing requirement would bar this action even if we were to assume the contract was one for the sale of goods.

the case, and thus the doctrine of part performance will not be used to overlook the writing requirement of § 2–201.

### Quantum Meruit

■■ In Count II, plaintiff alleges that even if we determine that B & J and Nortel did not enter an enforceable agreement, Nortel is liable under the doctrine of *quantum meruit. See Business Development Services, Inc. v. Field Container Corp.*, 96 Ill.App.3d 834, 52 Ill.Dec. 405, 422 N.E.2d 86, 94 (1st Dist.1981) (holding that a plaintiff may recover under *quantum meruit* where he fails to establish the express contract but shows that services were rendered). To state a claim for *quantum meruit* plaintiff must allege 1) that he performed services for the defendant; 2) the reasonable value of those services; and 3) that the defendant received from the plaintiff a benefit which it would be unjust for him to retain without paying the plaintiff. *Nardi & Co., Inc. v. Allbastro*, 20 Ill.App.3d 323, 314 N.E:2d 367 (1st Dist.1974). The only argument that . Nortel makes in opposition to this claim is that in addition to these factors plaintiff must establish that he expected to receive payment directly from the defendant. Nortel asserts that B & J's complaint does not satisfy this requirement because it states that B & J anticipated that it would receive payment by earning a profit from the resale of the JungleMUX product to a third party, and thus the third party would effectively be paying B & J's fee.

In support of this argument defendant cites *Owen Wagener & Co. v. U.S. Bank*, 297 Ill.App.3d 1045, 232 Ill.Dec. 160, 697 N.E.2d 902 (4th Dist.1998), where a real estate broker was retained by a property owner to locate a buyer after a bank had instituted foreclosure proceedings on the owner's interest in the land. The broker located a buyer but the sale was not approved by the bank, which then foreclosed on the property and sold it to the same buyer that the broker had procured. *Id.* at 904–05. The broker sought to recover his commission under the theory of *quan-tum meruit. Id.* The court rejected the claim, reasoning that in his efforts to secure the buyer the broker never alleged that it gave the bank information about the potential purchasers non-gratuitously and thus never had the expectation of receiving payment from the bank. *Id.* at 909.

We think that the *Owen* decision is distinguishable from the situation presented in this case. Although defendant argues that *Owen* stands for the proposition that a plaintiff seeking to recover in *quantum meruit* must have expected payment to be handed directly from the defendant to the plaintiff, a careful reading of the opinion indicates that the court's decision turned more on the fact that the plaintiff's relationship was with the third party owner and it was on behalf of that party that plaintiff expended his efforts. Here, B & J alleges that it expended its time, effort, and expertise at Nortel's request specifically for the purpose of finding a buyer for Nortel's JungleMUX. Although B & J may have expected payment by reselling Nortel's product, rather than by receiving a check for its services, it nonetheless expected payment to arise directly from its relationship with Nortel and is not seeking to recover from a party unconnected to that primary agreement. Now, if B & J were attempting to recover from Divane Brothers, the electrical contractor to whom B & J introduced Nortel and to whom Nortel ultimately sold JungleMUX directly, we would have a situation more analogous to *Owen* because B & J would be attempting to recover from the accidental beneficiary of its relationship with Nortel. That, however, is not the case. In the absence of any other argument, we find that B & J has alternatively pled a *prima facie* case in *quantum meruit* and defendant's motion to dismiss that count is denied.

### Promissory Fraud

Plaintiff's third and final claim is for fraud. Nortel moves to dismiss that count on the grounds that misrepresentations allegedly made by Nortel's representatives

related only to future conduct (*i.e.*, that B & J *would become* the JungleMUX) distributor, and thus the claim is one for promissory fraud, which is not a cognizable claim under Illinois law.

To state a claim for fraudulent misrepresentation under Illinois law, a plaintiff must assert 1) that the defendant made a statement; 2) of a material nature; 3) which was untrue; 4) known by the person making it to be untrue, or made in culpable ignorance of its truth or falsity; 5) relied on by the victim to his detriment; 6) made for the purpose of inducing reliance; and 7) the victim's reliance led to his injury. *Doherty v. Kahn*, 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163, 167 (1st Dist.1997). This is somewhat different from the standard in most states because Illinois does not recognize a cause of action for promissory fraud and the alleged misrepresentation must consequently relate to a past or present fact, not a future or contingent event. *Razdan v. General Motors Corp.*, 979 F.Supp. 755, 759 (N.D.Ill.1997). Illinois makes an exception to this rule, however, where a plaintiff is able to show that the misrepresentations are part of a "scheme to defraud." The distinction is a fine one, and both the Illinois and federal courts, applying Illinois law, have repeatedly observed that in practice the exception is so broad that it nearly swallows the rule. *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir.1992) *citing Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 408 N.E.2d 782, 787 (4th Dist.1980). Nonetheless, we are bound to consider the different standards that repeatedly are said to govern these different claims.

The Illinois cases make it clear that the bar against claims for promissory fraud is at least in part aimed at preventing every contract case from becoming a claim for fraud as well. Thus, "mere assertions that, at the time it made the representations, the defendant had no intention to later follow them, cannot be sufficient to state a cause of action for fraud." *Haas*, 933 F.Supp. at 1392. What constitutes a "scheme to defraud," however, and thus an exception to the rule, is somewhat less well defined. It is usually said that in addition to an intentional misrepresentation plaintiff must allege, and ultimately prove, that defendant intended to induce plaintiff to act for defendant's benefit in reliance on the misrepresentation. *Id.; Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir.1995) (holding that "our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy"); *Price v. Highland Community Bank*, 722 F.Supp. 454, 460 (N.D.Ill.1989) ("if the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable"); *Concord Industries, Inc. v. Harvel Industries Corp.*, 122 Ill.App.3d 845, 78 Ill.Dec. 898, 462 N.E.2d 1252, 1255 (1st Dist.1984) ("[w]here a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where that other party relies upon it to his detriment, the false promise will be considered an intended scheme to defraud the victim and will be actionable").

This is what plaintiff alleges in the case before us. B & J claims that Nortel's agents not only misrepresented Nortel's intent to enter into a business relationship, at least with respect to the Metra project, but that they did so in order to cause B & J to use its industry connections, knowledge and expertise to ensure that the JungleMUX product was incorporated in the electrical contractor's bid on the project. B & J alleges that in reliance on Nortel's misrepresentations that it would be compensated, B & J invested hundreds of hours working with Nortel, networking in the local transportation market, preparing

studies and presentations of the product, and attending meetings with contractors and Metra representatives. We find that these allegations adequately state a claim for promissory fraud under the rule and exception examined above and defendant's motion to dismiss is consequently denied.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss is denied.